## DAVIS *v.* STATE

[No. 78, September Term, 1964.]

*Decided December 7, 1964.*

Appeal from the Circuit Court for Wicomico County (DUER, C. J., and TAYLOR, J.).

The cause was argued before HENDERSON, C. J., and HAM-MOND, HORNEY, SYBERT and OPPENHEIMER, JJ.

*Raymond S. Smethurst, Jr.* and *John B. Robins* for the appellant.

*Richard M. Pollitt, Special Attorney,* with whom were *Thomas B. Finan, Attorney General,* and *Alfred T. Truitt, Jr., State's Attorney for Wicomico County,* on the brief, for the appellee.

OPPENHEIMER, J., delivered the opinion of the Court.

This is an appeal from a judgment of the Circuit Court for Wicomico County under which the appellant was sentenced to a term of eighteen years after a jury verdict of second degree murder. The appellant contends that the trial court committed reversible error in its instructions to the jury that all homicides are presumed to be murder and that the burden is on the accused to show circumstances of alleviation, excuse or justification; that the appellant's motion for acquittal filed at the close of the State's case and again at the conclusion of all the testimony should have been granted; and that the trial court committed reversible error in allowing the prosecution to examine the appellant concerning his escape from jail where he was awaiting trial.

The appellant, Davis, at the time of the alleged crime, was thirty years of age and was employed as a subcontractor by a house building concern known as Jim Walter Homes Corporation, whose office was a few miles north of Salisbury. The victim, Russell Edward Farmer, generally referred to in the testimony as "Pete", was the manager of the Salisbury office. Davis was working for Farmer on an unfinished construction job. On the day of the alleged crime, Davis was trying to get a pay check from Farmer. Davis' efforts to obtain this check continued from the morning of June 10th through the evening.

During the day, Farmer and Davis inspected other construction sites on the Eastern Shore; in the course of their journey, they went to various taverns where they drank together. Early in the evening they returned to the corporation's office where a further discussion took place about the money owed Davis. Later, they left the office in Farmer's automobile. Farmer told Davis he could wait until morning for his check; Davis then told Farmer that if he did not receive the check that night he would tell the corporation's officers of some construction being done by Farmer personally with the use of company materials and that he would also tell Farmer's wife about a "pass" Farmer had made at Shirley Hunt, a seventeen year old girl with whom Davis had been living for about a year. Farmer then drove his car back to the office which he and Davis entered.

Davis, who took the stand in his own defense, testified that as they entered the office there was an argument during which he, Davis, called Farmer an obscene name and that Farmer thereupon swung at him with something. A fight ensued during which the two men struck each other, slammed into the wall, skidded across the office desk and ultimately to the floor, the struggling continuing until Davis ended on top of Farmer. At this point, according to Davis, the fighting ceased. Davis, hearing a knock on the front door, went to see who it was and told the visitor to "come back tomorrow". According to Davis' testimony, after further talk about the check and a search for a check book, Farmer lunged at Davis from behind and Davis shoved him against the filing cabinets and hit him. Davis testified that he assisted Farmer to the secretary's chair, where Davis left him conscious and crying. Davis admitted removing the diaphragms from the four telephones in the office, the effect of which was to make it impossible to transmit any recognizable sounds over the telephone, and then left in Farmer's car. Davis said he wanted a chance to get away before Farmer could telephone the police, as he feared Farmer would obtain a warrant for assault. Davis picked up Shirley Hunt at Federalsburg and went to her mother's home in Dover, Delaware, from whence he and the girl proceeded to Pittsburgh where they lived together until Davis was apprehended by the Federal Bureau of Investigation three weeks later. He said it was not until this time that he learned of Farmer's death.

On the morning after the fight, a State's witness, who had seen the two men together in the office early the preceding evening, reported to the State Police that he had found Farmer in his office apparently dead. Officers immediately went to the scene and found Farmer's body seated at his desk, his head on the desk and the front of his shirt torn off. They found that the diaphragms had been removed from the four telephones in the office; three of these diaphragms were later found in Farmer's automobile which Davis had taken and driven to Pittsburgh.

A pathologist at Peninsula General Hospital called by the State testified that he examined Farmer's body on the same day in which it was found. He found bruises on the neck, chest and lower extremities, eight broken ribs, laceration of pleura which caused hemmorrhage in the abdomen, hemmorrhage in the muscles of the chest, two pints of blood in the abdomen, and a fractured thyroid cartilage. Death was caused by strangulation and abdominal hemmorrhage. He attributed death to "strangulation—interruption of air exchange between capillaries and in the lungs * * * and hemmorrhage into abdomen", which could have been caused by a blow or kick. He found bruises on the neck but no evidence of fingernail marks. An Associate Medical Examiner for the State, who examined Farmer's body on the day it was found, testified that, in his opinion, he had been dead not less than six and not more than twelve hours. Farmer was a man of six feet two inches who weighed approximately two hundred and five pounds. Davis weighed about one hundred and seventy-five pounds and was five feet eleven or twelve inches tall. For a year, he had been a part-time professional boxer but he had not boxed professionally since January, 1952, prior to his entry into the Air Force.

Shirley Hunt, called by the State, testified that, when she and Davis were driving from Federalsburg to Pittsburgh, he had told her that he and Farmer had had a fight and he had taken Farmer's car. When Davis called for her, he complained that his hand was sore; he told her that "he had knocked Pete down and Pete had stayed down, so he picked him up * * *." She stated that Davis said that he had kicked Pete and that when Pete was down, he picked him up and put him at his desk.

I

The appellant contends that the trial court's instructions to the jury as to what constitutes homicide failed to comply with the decisions of this Court and violated his constitutional rights in placing on him the burden of proving his innocence.

The portion of the charge which is attacked reads as follows:

> "In Maryland felonious homicide is divided into two main classifications—one is murder, and the other is manslaughter. Murder has been defined as the unlawful killing of a human being with malice aforethought, and manslaughter to be the unlawful killing of another without malice aforethought. The law of this State presumes all homicides to be committed with malice aforethought and to constitute murder. The burden is on the accused to show circumstances of alleviation, excuse, or justification which will reduce the offense to manslaughter, or not guilty."

The court defined malice as follows:

> "Malice has been defined in this connection as the intentional doing of a wrongful act to another without legal excuse or justification. It includes any wrongful act done wilfully or purposely."

The charge proceeded to state that the verdict should be not guilty, if the jury found the accused had established that the assault and beating was "accidental, unintentional, without any fault on his part, or in self defense," but that if the jury found that the accused assaulted and beat the deceased with intent to inflict serious bodily harm upon him, "and without any just cause or excuse for so doing, or circumstance of mitigation," the accused would be guilty of murder in the second degree. The charge proceeded:

> "In this connection you are further advised that under the law, in the absence of justification, excuse, or some circumstance of mitigation, malice may be inferred when there is intent to inflict great bodily harm,

"or when one wilfully does an act, the natural tendency of which is to cause death or great bodily harm, in the absence of evidence to show a contrary intention."

No objection was taken, or, in our opinion, could properly have been taken, to the portions of the charge dealing with the presumption of the accused's innocence and the State's burden to prove his guilt beyond a reasonable doubt. The portion of the charge dealing with the law as to self defense and the burden upon the accused to show "circumstances in mitigation" to reduce the grade of homicide to manslaughter, in our opinion, was clear and in accord with our decisions. The burden is upon the State to prove an unlawful killing, but the burden of proof of self-defense is upon the defendant. *Perry v. State,* 234 Md. 48, 197 A. 2d 833 (1964); *Davis v. State,* 204 Md. 44, 102 A. 2d 816 (1954).

Since *Chisley v. State,* 202 Md. 87, 95 A. 2d 577 (1953), we have repeatedly pointed out that the charge of the trial court to the jury in a murder case, in referring to the presumption that all homicides are committed with malice, should include the instruction that malice may be inferred "in the absence of justification, excuse or some circumstance of mitigation." *Davis v. State,* 204 Md. 44, 51, 102 A. 2d 816 (1954). See also *Bruce v. State,* 218 Md. 87, 98, 145 A. 2d 428 (1958); *Gunther v. State,* 228 Md. 404, 179 A. 2d 880 (1962). In *Gunther,* Judge Horney, for the Court, said: "[W]e do deem it expedient to point out *again* that when a trial court has occasion to cite or refer to that part of the *Chisley* case, stating that '[t]he law presumes all homicides to be committed with malice aforethought and to constitute murder,' the citation or reference should be so modified by way of preface or conclusion, as to state that 'in the absence of justification, excuse or some circumstances of mitigation, the law presumes all homicides to be committed with malice aforethought and to constitute murder,' or by words to that effect." 228 Md. at 411-12.

In this case, despite the trial court's failure to follow our exhortations in the first portion of the charge, the omission was remedied when the law as to malice and burden of proof

was fully and properly explained several times in the remainder of the charge. Even in the part of the charge to which objection is taken, the court properly began its instruction by a classification of "felonious" homicide. The following portions of the instruction made it clear that there is not malice unless the wrongful act is done without legal excuse or justification.

The State's evidence was strong as to the fact that the appellant had killed Farmer; Davis took the stand to endeavor to show he had acted in self-defense. The trial court's instructions that if the jury found the assault and beating was in self-defense, the verdict should not be guilty; as to what constitutes justifiable self-defense; and the circumstances in mitigation which would reduce the crime to manslaughter, fairly stated the legal principles involved. We find no reversible error in the charge.

II

The appellant contends that there was no real evidence of malice and that it was prejudicial error for the trial court to deny his motions for a directed verdict of acquittal as to murder. We do not agree. An actual intent to take life is not necessary for a conviction of murder if the intent is to commit grievous bodily harm and death occurred in consequence of the attack. *Webb v. State,* 201 Md. 158, 93 A. 2d 80 (1952). The nature of the injuries inflicted upon Farmer of itself was evidence of malice for the jury's consideration. Wharton, *The Law of Homicide* § 95 (3d. ed. 1907). The brutality and severity of a beating are evidence of an intent to commit a homicide. *Morrison v. State,* 234 Md. 87, 198 A. 2d 246 (1964).

The act of the appellant in removing the diaphragms from the telephones of itself was evidence of malice. "[T]he act of the slayer in trying to prevent the giving of aid to the deceased while in an injured and dying condition is also evidence of malice." Wharton, *The Law of Homicide* § 96 (3d. ed. 1907). The appellant's explanation of this action gave another motive for what he did but this testimony was for the jury's consideration; the jury might well have inferred from that act, which the appellant admitted, that his real motive was an endeavor to prevent the giving of aid to Farmer.

While there was testimony that Davis and Farmer were on friendly terms on the day of the alleged crime and were drinking together, Davis admitted that during the argument that he had threatened to tell Farmer's wife about the "pass" Farmer had made at Shirley Hunt. Knowledge of this episode concerning the girl with whom Davis was living may properly have been considered as evidence of "bad blood" between Davis and Farmer. On all the testimony, there was no error by the trial court in denying Davis' motions for acquittal of murder.

## III

The appellant contends that the trial court committed reversible error in overruling his objections to the questions asked him on cross-examination relating to his escape from the Wicomico County Jail while awaiting trial. He argues that he had not then been tried for the separate crime of escape, and that this was a deprivation of his constitutional right not to be compelled in any criminal case to be a witness against himself. He concedes that by taking the stand in his own behalf he waived some of his constitutional rights, but contends the only rights waived were those relevant to the charge for which he was then on trial.

Flight from the scene of a crime is a factor that may be considered in determining guilt. *Tasco v. State,* 223 Md. 503, 509, 165 A. 2d 456 (1960), *cert. denied* 365 U. S. 885; *Clay v. State,* 211 Md. 577, 128 A. 2d 634 (1957). In both of those cases, the flight was almost contemporaneous with the crime. In this case, Davis' escape from jail was in August, several months after the alleged crime. However, the lapse of time between the crime and the attempted flight goes only to the weight to be accorded to this circumstance, not to the admissibility of the attempt as some evidence of consciousness of guilt.

"Flight from justice, and its analogous conduct, have always been deemed indicative of a consciousness of guilt. * * * It is today universally conceded that the fact of an accused's flight, *escape from custody,* resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself * * *." (Emphasis supplied), Wigmore, *Evidence* § 276 (3d

ed. 1940). In *State v. McTague,* 190 Minn. 449, 252 N. W. 446 (1934), the defendant, after indictment, had given a bond to secure his appearance. He later forfeited the bond and fled from the state. The court held that the evidence of flight was properly admitted, saying: "Flight before apprehension or after arrest and when on bail is a circumstance to be considered—not as a presumption of guilt, but as something for the jury—as suggestive of a consciousness of guilt * * *." 190 Minn. at 453. In *People v. Arnold,* 199 Cal. 471, 250 Pac. 168 (1926), the State offered testimony as to the finding of fresh cuts upon the cell bars in which the defendants were incarcerated and the location of about a dozen saws concealed in a box to which the defendants had access. The court held that this evidence was properly admitted as a circumstance tending to show a consciousness of guilt.

The fact that the evidence of the escape from jail was adduced on cross-examination, rather than offered as a part of the State's case, does not make that testimony inadmissible. A defendant in a criminal case who voluntarily takes the witness stand in his own behalf thereby subjects himself to the same rules of cross-examination that govern other witnesses. *Stevens v. State,* 232 Md. 33, 192 A. 2d 73 (1963); *Adams, Nelson, and Timanus v. State,* 200 Md. 133, 88 A. 2d 556 (1952); *Allen v. State,* 183 Md. 603, 39 A. 2d 820 (1944); *Guy v. State,* 90 Md. 29, 44 Atl. 997 (1899). He may properly be cross-examined as to his prior criminal record. *Taylor v. State,* 226 Md. 561, 174 A. 2d 573 (1961); *Burgess v. State,* 161 Md. 162, 155 Atl. 153 (1931). Cross-examination as to an escape, even before trial for that offense, in our opinion, is equally permissible. The fact that the testimony was, as we hold, properly admitted in the appellant's trial for murder does not mean that his admission on the stand in this case could have been used against him in a separate trial for the escape.

*Judgment affirmed.*