876 A.2d 142

**Tamere Hassan THORNTON**

v.

**STATE of Maryland.**

**No. 1608, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

June 15, 2005.

720

Nancy S. Forster (Eve L. Brensike, Asst. Public Defenders, on the brief), Baltimore, for appellant.

Rachel Marblestone Kamins (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Panel: MURPHY, C.J., KRAUSER, JOHN C. ELDRIDGE, (Retired Specially Assigned) JJ.

KRAUSER, J.

Following a bench trial in the Circuit Court for Baltimore County, sixteen-year-old Tamere Hassan Thornton was convicted of the second-degree murder of seventeen-year-old Kevin Taylor as well as carrying a weapon openly with the

intent to injure.[1] Sentencing the youth to a term of fourteen years' imprisonment for second-degree murder, the court lamented:

> I think the word most used about this case is the word tragedy, and maybe another word is sad because, you know, you have two kids who went to school, who worked, played sports, listened to their parents, went to church, they go to the mall, they shop for school, I mean, it's unbelievable. They argue. Kids argue all the time. They're teenagers. They have a fight. Teenagers fight, a right of passage, and in a flash, you know, one of them is dead and the other is in jail. I mean, these are not street wise kids. . . .

After concluding this sad commentary, the court merged, for sentencing purposes, carrying a weapon openly with the intent to injure with second-degree murder and imposed sentence.

Appellant now challenges his conviction for second-degree murder, presenting three questions for our consideration:

I.   Is the evidence that appellant stabbed the victim one time in the leg with a folding knife insufficient to sustain a conviction for second-degree murder?

II.  Did the trial court err when it convicted appellant of second-degree murder based on a diluted and erroneous interpretation of the required *mens rea?*

III. Did the trial court improperly reject appellant's imperfect self-defense claim based on an incorrect definition of the elements of that defense?

For the reasons that follow, we shall affirm the judgment of the circuit court as to the second-degree murder conviction, but vacate the circuit court's judgment as to the carrying a weapon openly with intent to injure charge.

---

1.   Appellant was indicted in the Circuit Court for Baltimore County on charges of first-degree murder and openly carrying a deadly weapon with the intent to injure.

## FACTS

On the evening of August 30, 2002, appellant was with a group of male friends, shopping at the Towson Town Center in Towson, Maryland, as was the victim, Kevin Taylor. When the two groups met inside the mall, there was an exchange of words between a friend of appellant's, Orion Brandon Beard, and a friend of Taylor's, who was identified only as "Jason." The two knew each other and apparently had never gotten along. When they were asked to leave by a manager of one of the mall's stores, they agreed to take the argument "outside." They left, followed by their respective friends, which included appellant and Taylor.

Once outside the mall, the argument became heated. Fists flew and the two young men fell to the ground and began to wrestle. Mathew Mayer, on a "smoke break" from a nearby mall restaurant when he witnessed the fight, stated: "I am hesitant to call it a fight so much as a tussle in that . . . it was more posturing than fighting . . . they were wrestling lot of grabbing and trying to see who could, you know, take each other to the ground but it wasn't . . . I'm going to beat this guy to a pulp."

While Beard and Jason tussled, appellant purportedly yelled at the other group, "which one of you niggers wants to get in on this." Responding to the challenge, Taylor took off his shirt and walked towards appellant. As Taylor approached, appellant pulled a folding knife. It had two blades; each was three inches long. When Taylor did not back off, appellant stabbed Taylor in the thigh, apparently twice, leaving two wounds—one three inches deep, the full length of the knife's blade and another one-half inch deep. Taylor then froze, staggered backwards and fell down, whereupon appellant ran from the scene. Taylor was eventually transported to the shock trauma unit of the University of Maryland Medical Center, where he died twenty-one hours later.

Doctor Patricia Aronica–Pollak, an Assistant Medical Examiner in Maryland's Office of the Chief Medical Examiner, performed an autopsy on Taylor. She testified at trial that

she found two stab wounds and one "cutting" wound on Taylor. One stab wound was to the left "inguinal" or groin area. Three inches deep, it cut into two major blood vessels, the "left external iliac artery and vein," causing extensive bleeding. The other stab wound was to the "anterior lateral aspect of the left thigh." One-half inch deep, it cut into only skin and soft tissue. The cutting wound was located on the right forearm and it too injured only skin and soft tissue. Based upon her examination, Dr. Pollak concluded that the "wounds with complications" caused Taylor's death.

## I.

Appellant attacks the sufficiency of the evidence, employing a two-step strategy. First, he redefines second degree murder to include an additional element, which, in effect, narrows the definition of that offense. Then, having limited the applicability of this form of homicide, he argues that the killing of which he has been convicted falls outside that definition.

To be more precise, he recasts second-degree murder so that more than just proof that victim's death was the result of the "intentional infliction of serious bodily harm" is required. He adds that proof must be presented that the victim's death was the likely result of that harm. Then, turning to the specific facts of his case, he minimizes the deadliness of the injury he inflicted, dismissing it as "single stab wound" to an unspecified portion of Taylor's leg. His vagueness as to the exact location of the wound he inflicted is understandable, as a more detailed account of that wound swiftly exposes its potential lethality. In any event, neither step in appellant's two-step analysis advances his cause.

■ Maryland law, appellant asserts, defines the form of second-degree murder of which he was convicted as the "killing of another person with . . . the intent to inflict such serious bodily harm that death would be the likely result." That definition, he argues, is incompatible with his conviction for second-degree murder, since, in his words, "[n]o rational fact-finder could conclude beyond a reasonable doubt that 'the

likely' consequence of a single stab wound to the leg [would be] death." In brief, his argument is this: Second-degree murder of the "intentional infliction of serious bodily harm" variety requires a finding that the victim's death was the likely result of the serious bodily harm intentionally inflicted. Taylor's death was not the likely result of "the single stab wound" to the leg appellant inflicted. Therefore, he was not guilty of second-degree murder. This syllogism does not survive inspection. Its major premise—that second-degree murder requires a separate finding that death was the "likely result" of the serious bodily harm inflicted—is flawed. It does not reflect either past or current Maryland law.

In short, appellant misconstrues Maryland law, though, in fairness to him, his misconstruction is understandable. Maryland Criminal Pattern Jury Instruction ("MCrPJI") 4:17 does state, as he claims, that, to prove second-degree murder, the State must show that death not only resulted from the harm but that it was the "likely" result of the harm. That instruction provides:

> Second degree murder is the killing of another person with either the intent to kill or the intent to inflict such serious bodily harm that death would be the likely result. Second degree murder does not require premeditation or deliberation. In order to convict the defendant of second degree murder, the State must prove:
>
> (1) that the conduct of the defendant caused the death of (victim); and
>
> (2) that the defendant engaged in the deadly conduct either with the intent to kill or with the intent to inflict such serious bodily harm that death would be the likely result.

MCrPJI 4:17.

Although that instruction states that "[s]econd degree murder is the killing of another person with ... the intent to inflict such serious bodily harm that death would be the likely result[,]" we find no support for appellant's thesis that that instruction substantively changed the law in Maryland. It is

well settled in Maryland that, to prove second-degree murder, the evidence need only show that the death of the victim resulted from the intentional infliction of serious bodily harm. *See Webb v. State,* 201 Md. 158, 162, 93 A.2d 80 (1952); *Davis v. State,* 237 Md. 97, 104, 205 A.2d 254 (1964); *State v. Ward,* 284 Md. 189, 199, 396 A.2d 1041 (1978), *overruled on other grounds by Lewis v. State,* 285 Md. 705, 404 A.2d 1073 (1979); *Goodman v. State,* 6 Md.App. 187, 193, 250 A.2d 684 (1969). And while *Mitchell v. State,* 363 Md. 130, 147, 767 A.2d 844 (2001) and *Burch v. State,* 346 Md. 253, 274, 696 A.2d 443 (1997), two cases which appellant cites in support of his proposition, do define second degree murder, as it is articulated in MCrPJI 4:17, they do so only perfunctorily and in passing, as a part of a prefatory synopsis of various forms of second-degree murder. Neither case addresses the question of what constitutes "intentional infliction of serious bodily harm" second-degree murder. Nor should they have because that issue was not before the Court in either instance.

█ Furthermore, the pattern jury instruction at issue did not and could not have changed Maryland law. Jury instructions in Maryland are merely advisory. Their "main purpose ... is to aid the jury in clearly understanding the case and considering the testimony; to provide guidance for the jury's deliberations by directing their attention to the legal principles that apply to and govern the facts in the case; and to ensure that the jury is informed of the law so that it can arrive at a fair and just verdict." *Boone v. American Manufacturers Mutual Insurance Co.,* 150 Md.App. 201, 226, 819 A.2d 1099 (2003), *cert. denied,* 376 Md. 50, 827 A.2d 112 (2003) (citation omitted).

Moreover, *Davis,* 237 Md. at 97, 205 A.2d 254, the case cited in the Comment to MCrPJI 4:17 as authority for the "likely result" language, does not depart from Maryland's traditional definition of second-degree murder. In fact, the *Davis* Court approved the trial court's instruction "that if the jury found that the accused assaulted and beat the deceased with intent to inflict serious bodily harm upon him, 'and without any just

cause or excuse for so doing, or circumstance of mitigation,' the accused would be guilty of murder in the second degree." *Id.* at 102, 205 A.2d 254. And it declared, without qualification: "An actual intent to take a life is not necessary for a conviction of murder if the intent is to commit grievous bodily harm and death occurred in consequence of the attack." *Id.* at 104, 205 A.2d 254.

In sum, MCrPJI 4:17 does not add a likelihood requirement to the "intentional infliction serious bodily harm" form of second-degree murder. What it does do is make express that which was always implied: that the intentional infliction of serious bodily harm always carries with it the substantial risk that death will follow. Thus, to convict an accused of second-degree murder, the State need only convince the fact finder beyond a reasonable doubt that an accused acted with the intention to inflict serious bodily harm and that death was a consequence of that harm.

Having considered and rejected appellant's claim of what constitutes the "intentional infliction of serious bodily harm" variety of second-degree murder, we turn to appellant's claim that the evidence did not support his conviction for second-degree murder. In reviewing the sufficiency of the evidence adduced, as appellant has requested we do, we consider "the evidence in the light most favorable to the prosecution." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *accord State v. Smith,* 374 Md. 527, 533, 823 A.2d 664 (2003). We then determine whether, based on that evidence, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781; *accord Smith,* 374 Md. at 533, 823 A.2d 664. The test is " 'not whether the evidence *should have or probably would have* persuaded the majority of fact finders but only whether it *possibly could have* persuaded *any* rational fact finder.' " *Mora v. State,* 123 Md.App. 699, 727, 720 A.2d 934 (1998), *aff'd on other grounds,* 355 Md. 639, 735 A.2d 1122 (1999) (quoting *Fraidin v. State,* 85 Md.App. 231, 241, 583 A.2d 1065 (1991)).

After reviewing the evidence in a light most favorable to the prosecution, we conclude that there was sufficient evidence to sustain appellant's conviction of second-degree murder.

Appellant was armed with a knife, and issued a challenge to fight to a group of boys. When Taylor accepted the challenge and approached, appellant first drew his knife to scare Taylor off. But, when that did not happen, he stabbed Taylor, inflicting what appellant has characterized as a "single stab wound to the leg." That general characterization does not, however, do justice to the deadliness of the wound. Appellant stabbed the victim in the "inguinal" or groin area, thrusting the full length of the blade—three inches—into an area where, as we observed in another case, "parts of the gastrointestinal tract as well as . . . the large femoral artery and the femoral nerve" are located. *Goodman,* 6 Md.App. at 193, 250 A.2d 684. That thrust "cut into two major blood vessels", the "left external iliac artery and vein," causing extensive bleeding and ultimately death. As the wound not only caused Taylor's death but, because of its depth and location, was also "likely" to cause Taylor's death, the circuit court would not have erred even if it had found appellant guilty under appellant's narrower definition of second-degree murder.

But, even if the wound inflicted by appellant had been to a less vital area of the leg, we would reach the same result. In *Ward,* the Court chose the following hypothetical to illustrate the nature of "intentional infliction of serious bodily harm" murder: "if A shoots B in the leg with the intention of doing him serious bodily harm short of death but the injury thereby done to B results in the death of B, however contrary this may be to A's intention, A is guilty of murder in the second degree." *Ward,* 284 Md. at 199, 396 A.2d 1041. That illustrative example is in all respects, save the nature of the deadly weapon involved, identical to the case now before us.

## II.

Appellant contends that the circuit court convicted him of second-degree murder based on a "diluted and erroneous"

interpretation of the applicable *mens rea.* He explains: The court "improperly diluted the definition of grievous bodily harm" by holding "that death is a probable consequence whenever a person inflicts serious bodily harm"; it improperly relieved the State of its burden of proving that appellant acted with the specific intent to inflict grievous bodily harm; and it unconstitutionally shifted the burden of proof on the element of intent onto appellant.

Appellant chiefly relies on snippets he extracts from exchanges between bench and counsel during trial, and the court's explanation for why it was finding appellant guilty of second-degree murder. During one of those exchanges, the court stated:

> [I]f subjectively he's thinking yeah, he swings out and stabs him in the leg just to get him away but he dies, and he at no time had any intent to kill anybody ... but he uses [what] ... turns out to be serious bodily harm, even though that wasn't what he was after either.... I mean, isn't the law that you do something like that, the consequences are yours.

And, in finding appellant guilty of murder, the court extemporized:

> [W]e are called upon to be responsible for our actions and when you take a knife such as introduced into evidence ... one knows that by thrusting that knife out, even though if it was in the leg, it was going to inflict serious bodily harm on whomever was struck and when you inflict serious bodily harm, one of the possible consequences or probable consequences, rather, is death.

Because we have addressed the first point—whether death is a probable or likely consequence of serious bodily harm—in the preceding section of this opinion, we shall devote our attention to appellant's remaining two points: that the court, by its ruling, improperly relieved the State of its burden to prove that appellant acted with specific intent to inflict serious bodily harm, and then unconstitutionally shifted the burden of proof as to intent to appellant.

■ While general intent only requires an "intent to do [an] immediate act with no particular, clear or undifferentiated end in mind," specific intent "embraces the requirement that the mind be conscious of a more remote purpose or design which shall eventuate from the doing of the immediate act." *Chen v. State*, 370 Md. 99, 110 n. 5, 803 A.2d 518 (2002). Although requiring a higher level of proof, specific intent, as general intent, may be proven by circumstantial evidence. *Smallwood v. State*, 343 Md. 97, 104, 680 A.2d 512 (1996). Indeed, the trier of fact may infer intent from the accused's own actions. *Id.* at 104, 680 A.2d 512.

■ Although appellant stabbed Taylor, it was not, he asserts, with the intent to cause serious bodily harm. Rather, he used the knife, appellant maintains, just to scare Taylor off and that explanation, he contends, the court accepted. In his brief, appellant states that "[t]he trial judge, crediting Appellant's stated intention, suggested that Appellant stabbed Taylor 'just to get him away' and that Appellant 'wasn't . . . after' serious bodily harm."

What the court actually said was: "[I]f subjectively he's thinking, yeah, he swings out and stabs him in the leg just to get him away but he dies, and he at no time had any intent to kill anybody . . . but he uses [deadly force] . . . [and it] turns out to be serious bodily harm, even though that wasn't what he was after either." Thus, contrary to appellant's claim, the court was not "crediting appellant's stated intention" but merely speaking hypothetically.

Moreover, appellant is not focusing on the correct moment in time. It may be true that appellant initially pulled the knife from his pocket with the intent to scare Taylor, but it is appellant's intent at the moment he used the knife to stab Taylor in the leg that is crucial. At that moment, his intent to scare was transformed into an intent to cause serious bodily injury. Consequently, the appellant's argument fails on this point.

■ Citing the court's statements that "we are called to be responsible for our actions," and its rhetorical question "isn't

the law that you do something like that, [stab someone in the leg] the consequences are yours," appellant next contends that the circuit court presumed that appellant intended the consequences of his actions and, thereby, improperly shifted the burden of proof of intent to appellant.

But these comments did not amount to a shifting of the burden of proof to appellant as occurred in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), the case appellant principally relies upon in advancing this argument. In *Sandstrom*, the defendant was charged under Montana law with "deliberate homicide," which requires that the defendant "purposely or knowingly cause[ ] the death" of the victim. 442 U.S. at 512, 99 S.Ct. 2450. At the close of the evidence, the prosecution requested that the trial judge instruct the jury that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." *Id.* at 513, 99 S.Ct. 2450. Defense counsel objected stating that " 'the instruction ha[d] the effect of shifting the burden of proof on the issue of' purpose or knowledge" on to the defendant. *Id.* Overruling defense counsel's objection, the court instructed the jury in accordance with the prosecutor's request. *Id.* After the jury returned a guilty verdict, the defendant raised this issue on appeal. Affirming the judgment of the trial court, the Supreme Court of Montana declined to find a constitutional violation in this instruction. *Id.* But the United States Supreme Court did. Holding that the instruction violated the defendant's due process rights, the Court declared that the "jury may have interpreted the judge's instruction as constituting either a burden-shifting presumption ... or a conclusive presumption...." *Id.* at 524, 99 S.Ct. 2450.

Here, in contrast to *Sandstrom*, the circuit court did not create a *presumption* by observing that a person intends the consequences of his volitional acts. Indeed, when the court's statements are read in context, it is clear that is not what the court meant. It was only stating that "it is always permissible to infer that one intends the natural and foreseeable consequences of his or her conduct." *Ford v. State*, 90 Md.App.

673, 683 n. 3, 603 A.2d 883 (1992). And that observation hardly constitutes error.

## III.

Appellant contends that the trial court improperly rejected his claim of imperfect self-defense. In support of that contention, he advances three arguments. First, he claims that the circuit court employed an incorrect definition of imperfect self-defense. Second, he claims that the circuit court erred in finding that he was the aggressor in the confrontation between Taylor and himself. And, third, he claims that the circuit court misunderstood the duty to retreat as it pertains to imperfect self-defense.

■ In Maryland, the elements for perfect self-defense are:
(1) The accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;

(2) The accused must have in fact believed himself in this danger;

(3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and

(4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*State v. Smullen,* 380 Md. 233, 252, 844 A.2d 429 (2004) (citation and emphasis omitted). The difference between perfect and imperfect self-defense is that in perfect self-defense " 'the defendant's belief that he was in immediate danger of death of [sic] serious bodily harm or that the force he used was necessary must be objectively reasonable.' " *Id.* at 253, 844 A.2d 429 (quoting *State v. Marr,* 362 Md. 467, 474, 765 A.2d 645 (2001)). Imperfect self-defense, on the other hand, arises when the " 'actual, subjective belief on the part of the accused that he/she is in apparent imminent danger of death or serious bodily harm from the assailant, requiring the use of

deadly force, is not an objectively reasonable belief.' " *Id.* at 252, 844 A.2d 429 (quoting *Marr,* 362 Md. at 473, 765 A.2d 645) (emphasis omitted). " 'In all other respects, the elements of the two doctrines are the same.' " *Id.* (quoting *Marr,* 362 Md. at 474, 765 A.2d 645). But the legal consequences are not.

"Unlike its 'perfect' cousin, 'imperfect' self-defense, if credited, does not result in an acquittal, but merely serves to negate the element of malice required for a conviction of murder and thus reduces the offense to manslaughter." *Marr,* 362 Md. at 474, 765 A.2d 645. That is because "a defendant who commits a homicide while honestly, though unreasonably, believing that he/she is threatened with death or serious harm and that deadly force was necessary does not act with malice, and, absent malice, cannot be convicted of murder." *Id.*

An aggressor is not entitled to a self-defense instruction if he initiated a deadly confrontation or escalated an existing confrontation to that level. *Cf. Watkins v. State,* 79 Md.App. 136, 139, 555 A.2d 1087 (1989) (holding that the accused was entitled to a jury instruction on self-defense, although he was the initial aggressor at the non-deadly level, because the victim was the one who escalated the fight from a non-deadly one to a lethal confrontation). Moreover, to be entitled to a self-defense instruction, an accused has a duty "to retreat or avoid danger if such means were within his power and consistent with his safety." *Burch,* 346 Md. at 283, 696 A.2d 443 (citation omitted).

The circuit court not only found that appellant was the aggressor but that having initiated the fight, he declined to retreat and escalated it into a deadly confrontation. In rejecting appellant's claim for imperfect self-defense, the circuit court stated, among other things, that appellant acted with "malice" because appellant "was the one that ... stirred the pot and stood his ground when the challenge was accepted by the victim."

We need not rehash once more the facts surrounding the stabbing. Suffice it to say that when the victim approached, it

was, as the trial court noted, at appellant's invitation. No evidence was presented, nor was it even alleged, that the victim was armed or that appellant could not have safely retreated. But there was evidence that, upon drawing his knife and plunging it into Taylor, appellant escalated the fight to a deadly confrontation. Consequently, the circuit court did not err in rejecting appellant's imperfect self-defense claim, and thereafter convicting him of second degree murder. Having concluded that the circuit court could have reasonably found that appellant was an aggressor in the fight, that he did not attempt to retreat but chose instead to escalate the impending confrontation into a lethal one, we need not address appellant's other contentions concerning imperfect self-defense.

### IV.

Appellant has not raised the issue, on appeal, of whether he was lawfully convicted of carrying a weapon openly with the intent to injure another. Nor was a separate sentence imposed for that offense. Instead, the court merged his conviction for openly carrying a weapon into his conviction for second degree murder for "sentencing purposes" and thereafter sentenced him on the second degree murder conviction. To avoid leaving appellant with an unreviewable and, we believe, unlawful conviction for that offense, we shall treat the "sentencing" merger of those two offenses as having created a final reviewable judgment as to both.

Section 4–101(c)(2) of the Criminal Law Article prohibits a person from wearing or carrying "a dangerous weapon, chemical mace, pepper mace, or a tear gas device openly with the intent or purpose of injuring an individual in an unlawful manner." Section 4–101 specifies:

(5)(i) "Weapon" includes a dirk knife, bowie knife, switch-blade knife, star knife, sandclub, metal knuckles, razor, and nunchaku.

(ii) "Weapon" does not include:

1. a handgun; or

2. a penknife without a switchblade.

Md.Code (1957, 2002 Repl.Vol.), § 4–101(a)(5) of the Criminal Law Article ("C.L.").

To establish a violation of C.L. § 4–101(c)(2), the State was required to prove beyond a reasonable doubt that the weapon appellant used did not fall within the statute's penknife exception. *Anderson v. State*, 328 Md. 426, 433–34, 614 A.2d 963 (1992). This it did not do. Nor could it have, given that "[p]enknives today are commonly considered to encompass any knife with the blade folding into the handle, some very large." *Mackall v. State*, 283 Md. 100, 113 n. 13, 387 A.2d 762 (1978).

The knife used by appellant had two blades; both of which "fold[ed] in the handle." It therefore constituted a "penknife," regardless of the length of its blades. Consequently, the circuit court erred in finding appellant guilty of violating C.L. § 4–101(c)(2).

**JUDGMENT AS TO SECOND–DEGREE MURDER AFFIRMED BUT JUDGMENT AS TO CARRYING A WEAPON OPENLY WITH THE INTENT TO INJURE REVERSED.**

**COSTS TO BE EVENLY DIVIDED BETWEEN THE APPELLANT AND BALTIMORE COUNTY.**

Concurring Opinion by MURPHY, C.J.

While I agree that appellant's "carrying" conviction should be reversed, having examined the knife that appellant used to inflict the fatal injuries, I write separately to request that the General Assembly revisit the "penknife exception" to C.L. § 4–101(c)(2).

While I recognize that, in light of *Roary v. State*, 385 Md. 217, 867 A.2d 1095 (2005), the precise issue presented in the case at bar is unlikely to arise very often in the future, I also write separately to address two issues that will certainly arise again: (1) how an appellate court reviews the verdict announced at the conclusion of a bench trial, and (2) how the

(trial and appellate) court goes about resolving conflicting interpretations of the applicable law.

When the appellant argues that the evidence presented by the State during a bench trial was insufficient to convict the defendant, we must determine whether that evidence was sufficient as a matter of law to support each factual finding necessary to the entry of the verdict. In a theft case, for example, we could not affirm a conviction based upon evidence that was insufficient as a matter of law "to permit the trial court to find properly that the [defendant] was a participant [in the theft]." *In re Appeal No. 504 September Term, 1974,* 24 Md.App. 715, 724, 332 A.2d 698 (1975).

When we are presented with the argument that the trial judge's factual findings do not support the guilty verdict, we must first examine each factual finding upon which the verdict is based. In the case at bar, for example, we could not affirm a murder conviction if the trial judge had said, "I am not persuaded that the defendant intended to inflict serious bodily harm."

We must then examine the relationship between each essential factual finding and the applicable law. In the case at bar, for example, we could not affirm a murder conviction if the trial judge had said, "Even though I am not persuaded that the defendant intended to kill the victim, and I am not persuaded that the defendant intended to inflict serious bodily harm, the fact is that the victim died as a result of the injuries inflicted by the defendant, so the defendant is guilty of second degree murder."

In the case at bar, the evidence was sufficient to support the inference that appellant stabbed the victim in the groin with the intent to inflict serious bodily harm. The question is whether the circuit court actually made that essential finding of fact. To determine whether the factual findings announced by the trial judge support the verdict at issue, we must presume that the trial judge knows the law and applies the law correctly. In my opinion, nothing in the record of the case at bar rebuts that presumption. I am not persuaded that

the trial judge's verdict was based upon an incorrect interpretation of the elements that must be proven in order to convict a defendant of second degree murder.

To resolve the issue of whether appellant's murder conviction should be reversed on the ground that the trial judge did not find that appellant acted "with the intent to inflict such serious bodily harm that death would be the likely result," it may be helpful to hypothesize a jury trial in which the jurors were presented with the very same evidence presented in the case at bar. Assume that, at the conclusion of the State's case-in-chief, defense counsel moves for a judgment of acquittal on the ground that the State failed to present any evidence that death is a "likely result" of the defendant's conduct. Should the trial judge grant this motion?

Assume that, during the jury instructions conference, defense counsel requests the following instruction:

The State must prove that, at the point in time when the defendant engaged in the conduct that caused the victim's death, the defendant was aware of the fact that death would be the likely result.

Would the defendant be entitled to such an instruction?

Assume that the trial judge (1) in accordance with the MPJI–Cr instructions, instructed the jury that the State must prove "that the defendant engaged in the deadly conduct either with the intent to kill or with the intent to inflict such serious bodily harm that death would be the likely result," and (2) has now received the following note from the jury:

We need additional instructions. (1) Please clarify the meaning of "likely." (2) Does a murder conviction require a finding that, at the time the defendant stabbed the victim, the defendant realized that the victim was "likely" to die from the stab wound?

How should the trial judge respond to this note?

To answer these questions, the trial judge would no doubt examine the cases discussed in the majority opinion and in the dissenting opinion. Although none of those cases includes an

actual holding that squarely addresses any of the hypothetical questions, if I were the trial judge who was called upon to answer the questions, I would rely most heavily upon *State v. Ward*, 284 Md. 189, 396 A.2d 1041 (1978), in which a unanimous Court of Appeals held that a defendant can be charged with and convicted of being an accessory before the fact of murder in the second degree. While explaining why there is "a rational basis" for this conclusion, the *Ward* Court stated:

So, if A shoots B in the leg with the intention of doing him serious bodily harm short of death but the injury thereby done to B results in the death of B, however contrary this may be to A's intention, A is guilty of murder in the second degree.

*Id.* at 199, 396 A.2d 1041. My decision to rely upon *Ward*, however, would not constitute a "disapproval" of *Burch*, *Mitchell*, or *Sifrit*.

Moreover, in relying upon *Ward* to resolve the issue presented in the case at bar, I would be "comforted by the realization that" this decision can be reviewed and corrected. *Stevenson v. State*, 289 Md. 167, 189, 423 A.2d 558 (1980). In *Stevenson*, Judge Digges concluded his majority opinion by reaffirming the following proposition found in *Anderson v. Baker*, 23 Md. 531 (1865):

If we err in our conclusions, we congratulate ourselves there is a Supreme Court erected expressly for the final adjudication of such questions, where our judgment may be reviewed and corrected, and the rights of the citizen vindicated. To this we cheerfully defer confidant that none will more cordially concur in the result. [*Anderson v. Baker*, 23 Md. 531, 629 (1865).]

*Stevenson, supra*, 289 Md. at 189, 423 A.2d 558.

What the Court of Appeals stated in *Anderson* and in *Stevenson* applies with equal force to the judges of the Court of Special Appeals. When a judgment of this Court is corrected by the Court of Appeals, we are comforted by the fact that our judgment has been reviewed and corrected by the Su-

preme Court of this State, and we cordially concur in the result.

Opinion by ELDRIDGE, J., Concurring in Part and Dissenting in Part.

I fully concur in that portion of the judgment and the Court's opinion which reverses the conviction for carrying a weapon openly with the intent to injure. I flatly disagree, however, with the majority's overruling or disapproval of the most recent Court of Appeals' opinions defining or setting forth the requirements for one type of second degree murder. If the most recent Court of Appeals' opinions on a subject are to be overruled or disapproved, it should be done by the Court of Appeals as the Supreme Court of this State, and not by this Court.

In *Burch v. State,* 346 Md. 253, 696 A.2d 443, *cert denied,* 522 U.S. 1001, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997), the Court of Appeals began its resolution of a second degree murder jury instruction issue by setting forth the basic definition or scope of second degree murder under Maryland law. Judge Wilner for the Court in *Burch* stated (346 Md. at 274, 696 A.2d at 454, emphasis added):

"Second degree murder embraces a killing accompanied by any of at least three alternative *mentes reae:* killing another person (other than by poison or lying in wait) with the intent to kill, but without the deliberation and premeditation required for first degree murder; killing another person *with the intent to inflict such serious bodily harm that death would be the likely result;* and what has become known as depraved heart murder—a killing resulting from 'the deliberate perpetration of a knowingly dangerous act with reckless and wanton unconcern and indifference as to whether anyone is harmed or not.'"

Four years later, the Court of Appeals reiterated the definition of the type of second degree murder involved in the instant case, stating "that second degree murder embraced ... 'killing another person with the intent to inflict *such*

*serious bodily harm that death would be the likely result,' "*
*Mitchell v. State*, 363 Md. 130, 147, 767 A.2d 844, 853 (2001)
(emphasis added, internal quotation marks omitted). *See also*
*B. Sifrit v. State*, 383 Md. 116, 138, 857 A.2d 88, 100–101 (2004)
(quoting the trial court's jury instruction on second degree
murder).

The Maryland Criminal Pattern Jury Instructions, prepared
by a Committee chaired by Judge Irma S. Raker of the Court
of Appeals, with numerous other distinguished Maryland crim-
inal law experts constituting the membership, repeatedly de-
fines the species of second degree murder here involved as
"the intent to inflict such serious bodily harm *that death would
be the likely result,*" MPJI–Cr 4:17, 4:17.1, 4:17.2, 4:17.3,
4:17.4, 4:17.5, 4:17.6, at 218, 223, 227, 233, 239, 246, 251, and
252 (1991, 2003 Supp.) (emphasis added).

The phrase "that death would be the likely result," con-
tained in the recent above-cited Court of Appeals cases and
pattern jury instructions, is, according to today's majority
opinion of this Court, erroneous. The majority labels it a
"misconstruction" of "Maryland law." "[I]n Maryland," the
majority states, "to prove second-degree murder, the evidence
need *only* show that the death of the victim resulted from the
intentional infliction of serious bodily harm." (Emphasis add-
ed). The majority continues:

"Thus, to convict an accused of second-degree murder, the
State need only convince the fact finder beyond a reason-
able doubt that an accused acted with the intention to inflict
serious bodily harm and that death was a consequence of
that harm."

Moreover, the various comments by the trial judge in this
case, regardless of the gloss which the majority may put on
them, shows that the above-quoted standard, or even a lesser
one with respect to the State's burden, was employed by the
trial court. The trial court stated that, "even though that
[serious bodily harm] wasn't what he [the defendant] was
after", then "you do something like that, the consequences are
yours." At another point, the trial court held that, if an

accused did something that in fact "was going to inflict serious bodily harm," death is one of the "probable consequences" and the defendant is guilty of second degree murder. Other comments by the trial judge, which were said in reference to the facts of this case and *not* "speaking hypothetically" as the majority chooses to interpret them, confirm the trial court's view that, regardless of intent, if in fact serious bodily harm is inflicted and death in fact results, the defendant is guilty of second degree murder.

In holding that, "to prove second degree murder, the evidence need *only* show that the death ... resulted from the intentional infliction of serious bodily harm" (emphasis added), and that the recent Court of Appeals opinions on the subject are erroneous, the majority cites *State v. Ward,* 284 Md. 189, 199, 396 A.2d 1041, 1047–1048 (1978); *Davis v. State,* 237 Md. 97, 104, 205 A.2d 254, 258 (1964), *cert. denied,* 382 U.S. 945, 86 S.Ct. 402, 15 L.Ed.2d 354 (1965); and *Webb v. State,* 201 Md. 158, 162, 93 A.2d 80, 82 (1952).

The *Webb, Davis,* and *Ward* cases do not compel, or even lend much support to, the majority's position. It is true that, in commenting upon the "intent to inflict serious bodily harm" type of murder, these opinions do not add the language "that death would be the likely result." With regard to the element of intent, however, the three opinions do not use the majority's "only" language or language to the effect that the State need show "only ... the intentional infliction of serious bodily harm".

In addition, the issue presented by the case at bar was not an issue in any of the three opinions relied upon.

*Webb v. State, supra,* involved a conviction of assault with intent to murder, and not a conviction of second degree murder. Furthermore, the language in *Webb* relied on by the majority today, 201 Md. at 161–162, 93 A.2d at 82, is a quotation from *Wharton, Criminal Law* (12th Ed.). The Court of Appeals has more recently criticized reliance upon *Webb's* quotations from *Wharton,* calling some of the quotations an "unfortunate use of language" and "misleading," *State*

*v. Jenkins,* 307 Md. 501, 511, 513, 515 A.2d 465, 470, 471 (1986).

The principal issue in *Davis v. State, supra,* was the validity of a jury instruction that "all homicides are presumed to be murder and that the burden is on the accused to show circumstances of alleviation, excuse or justification," 237 Md. at 99, 205 A.2d at 255. *Davis* upheld the instruction, and the *Davis* case was, of course, overruled by *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), and *State v. Evans,* 278 Md. 197, 362 A.2d 629 (1976). In addition, the language in *Davis* relied upon by the majority today, 237 Md. at 104, 205 A.2d at 258, was a repeat of the *Webb* language, with the Court citing *Webb* and *Wharton.* Furthermore, immediately after the language cited by the majority, the *Davis* opinion, *ibid.,* referred to the "nature of the injuries inflicted upon" the victim, and the "brutality and severity of" the "beating." This qualifies what was previously said and supports the later Court of Appeals' language in *Burch* and *Mitchell.*

In *State v. Ward, supra,* the trial court had dismissed the indictment, and the issues before the Court of Appeals concerned the correctness of the dismissal in light of the Maryland common law doctrine of accessoryship. The issues involving second degree murder were whether there may be an accessory before the fact of murder in the second degree and whether the indictment was sufficient for the defendant to be tried for such an offense. No issue regarding the intent element of "intent to do serious bodily injury" murder was presented in the *Ward* case. The language from *Ward,* 284 Md. at 199, 396 A.2d at 1047, relied on in the majority opinion today, was simply a quote from the *Davis* case and a quote from *Wharton.*

By relying on a quote from a criminal law encyclopedia contained, as dicta, in the *Webb, Davis,* and *Ward* opinions, the majority employs an extremely slender reed in its effort to disapprove of the later opinions by the Court of Appeals in

*Burch* and *Mitchell* and to overrule the pattern jury instructions.

The language of *Burch, Mitchell,* and the pattern jury instructions, including as a form of second degree murder a homicide with "the intent to inflict such serious bodily harm that death would be the likely result," does not, as suggested by the majority, "change" Maryland law or add a new element to the offense of second degree murder. The language "that death would be the likely result" simply clarifies or illuminates the intent element. It is consistent with the evidentiary principle that evidence of "using a deadly weapon directed at a vital part of the body" may give rise to an inference of an intent to commit grievous bodily injury or an intent to kill. *See, e.g., State v. Jenkins, supra,* 307 Md. at 513–515, 515 A.2d at 471–472, and cases there cited; *State v. Evans, supra,* 278 Md. at 205, 362 A.2d at 634 ("While it may be proper to infer an intention to kill or to do grievous bodily harm from the directing of a deadly weapon at a vital part of the human anatomy, it is improper to infer 'malice' therefrom"). Under the majority's and the trial court's formulation, however, if an accused directs a knife at the victim's finger, intending to inflict serious bodily harm, and the finger is severed, and, unknown to the accused, the victim is a hemophiliac, and bleeds to death, the accused will be guilty of second degree murder. The formulation of the "intent" element set forth in *Burch, Mitchell,* and the pattern jury instructions, would avoid this result.

To reiterate, if the language from the *Burch* and *Mitchell* opinions is to be disapproved or revised, it should be done by the Court of Appeals and not by this Court. I would reverse the murder conviction and remand the case for a new trial under the proper standards.