919 A.2d 678

Tamere Hassan THORNTON

v.

STATE of Maryland.

No. 62, Sept. Term, 2005.

Court of Appeals of Maryland.

March 20, 2007.

706

Eve L. Brensike, Assigned Pro Bono Counsel (University of Michigan Law School, Ann Arbor, MI; Nancy S. Forster, Public Defender and Michael R. Braudes, Assistant Public Defender, Baltimore), all on brief, for petitioner.

Celia Anderson Davis, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, Baltimore), on brief, for respondent.

Argued before BELL, C.J., RAKER, WILNER *, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, J.

Petitioner, Tamere Hassan Thornton, seeks review of a Court of Special Appeals's judgment affirming his conviction for murder in the second degree. In his petition for a writ of

---

* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

certiorari, which we granted, Thornton essentially presents two questions for our review:

1. Did the intermediate appellate court and the trial judge correctly interpret and apply the *mens rea* element of second-degree murder of the intent-to-inflict-grievous-bodily-harm variety?

2. Did the intermediate appellate court and the trial court correctly interpret and apply the law of imperfect self-defense?

*Thornton v. State*, 388 Md. 673, 882 A.2d 286 (2005). We shall hold that the Court of Special Appeals erred in affirming the trial court's interpretation and application of the intent element for the crime of second-degree murder. As trier of fact, the trial judge was permitted, but not required, to infer from Thornton's wilful act of thrusting the knife outward and into the victim that Thornton intended to commit such grievous bodily harm from which death would likely ensue; however, the trier of fact was not permitted to presume, from Thornton's conduct, that he intended to inflict grievous bodily harm as a matter of law or to presume anything from his use of the knife. Therefore, we reverse the judgment of the intermediate appellate court and remand the case for purposes of a new trial. Because of our disposition of the case, we need not address Thornton's second question.

## I.

Tamere Hassan Thornton was charged in the Circuit Court for Baltimore County with first-degree murder in violation of Md.Code (1957, 1996 Repl.Vol.), Art. 27 § 407,[1] and carrying a

---

1. Section 407 provides: **First degree murder-Generally.** All murder which shall be perpetrated by means of poison, or lying in wait, or by any kind of wilful, deliberate and premeditated killing shall be murder in the first degree.

 Section 407 has been recodified as Maryland Code (2002), § 2–201 of the Criminal Law Article and now reads in pertinent part:
 Murder in the first degree.
 (a) In general.—A murder is in the first degree if it is:
 (1) a deliberate, premeditated, and willful killing;

weapon openly with the intent to injure in violation of Md. Code (1957, 2002 Repl.Vol.), § 4–101(c)(2) of the Criminal Law Article.[2] After a bench trial, Thornton was found not guilty of first-degree murder, but guilty of second-degree murder and carrying a deadly weapon openly with the intent to injure. The trial court merged the weapons conviction with the conviction for second-degree murder. Thornton was sentenced to fourteen years imprisonment for second-degree murder. He appealed and a majority of a panel of the Court of Special Appeals affirmed the murder conviction, but vacated the weapons conviction.[3] *Thornton v. State,* 162 Md.App. 719, 876 A.2d 142 (2005).

---

(2) committed by lying in wait;

(3) committed by poison; or

(4) committed in the perpetration of or an attempt to perpetrate:

(i) arson in the first degree;

(ii) burning a barn, stable, tobacco house, warehouse, or other outbuilding that:

(1) is not parcel to a dwelling; and

(2) contains cattle, goods, wares, merchandise, horses, grain, hay, or tobacco;

(iii) burglary in the first, second, or third degree;

(iv) carjacking or armed carjacking;

(v) escape in the first degree from a State correctional facility or a local correctional facility;

(vi) mayhem;

(vii) kidnapping under § 3–502 or § 3–503(a)(2) of this article;

(ix) robbery under § 3–402 or § 3–403 of this article;

(x) sexual offense in the first or second degree;

(xi) sodomy; or

(xii) a violation of § 4–503 of this article concerning destructive devices.

The State charged Thornton under the statutory short form indictment. Md.Code (1957, 1996 Repl.Vol.), Art. 27 § 616. Pursuant to § 616, even though the indictment specifically charged murder in the first degree, the defendant, nonetheless, may be convicted of murder in the first degree, murder in the second degree, or manslaughter. *See State v. Ward,* 284 Md. 189, 200, 396 A.2d 1041, 1048 (1978); *Davis v. State,* 39 Md. 355, 376 (1874).

2. Section 4–101(c)(2) prohibits a person from wearing or carrying "a dangerous weapon, chemical mace, pepper mace, or a tear gas device openly with the intent or purpose of injuring an individual in an unlawful manner."

3. The intermediate appellate court determined that the knife used in this case constituted a "penknife without a switchblade," within the

A majority of the panel, in reliance upon *State v. Ward,* 284 Md. 189, 199, 396 A.2d 1041, 1047–48 (1978), *Davis v. State,* 237 Md. 97, 104, 205 A.2d 254, 258 (1964), *cert. denied,* 382 U.S. 945, 86 S.Ct. 402, 15 L.Ed.2d 354 (1965), and *Webb v. State,* 201 Md. 158, 162, 93 A.2d 80, 82 (1952), held that "to prove second-degree murder, the evidence need *only* show that the death of the victim resulted from the intentional infliction of serious bodily harm," regardless of whether death was a likely or even a probable result of that harm. *Thornton,* 162 Md.App. at 727–28, 876 A.2d at 147. (Emphasis added.) Further, the panel majority determined that the Pattern Jury Instruction, MPJI–Cr 4:17, which states that "[s]econd degree murder is the killing of another person with . . . the intent to inflict such serious bodily harm that death would be the likely result[,]" did not substantively "change" the law of Maryland because, "[i]t does not add a likelihood requirement to the intentional infliction of serious bodily harm form of second-degree murder." *Thornton,* 162 Md.App. at 728, 876 A.2d at 147. Essentially, the panel majority concluded that the intentional infliction of serious bodily harm variety of second-degree murder does not include or require a separate "likelihood requirement." *Id.* The "likelihood requirement," as reflected in the jury instruction, according to the panel,

> make[s] express that which was always implied: that the intentional infliction of serious bodily harm always carries with it the substantial risk that death will follow. Thus to convict an accused of second-degree murder, the State need only convince the fact finder beyond a reasonable doubt that an accused acted with the intention to inflict serious bodily harm and that death was a consequence of the harm."

*Id.*

In opposition to that view, Judge Eldridge, in his dissenting opinion, pointed out that the majority's reliance upon *Webb, Davis,* and *Ward* was misplaced because those cases "[w]ith

meaning of § 4–101(a)(5) of the Criminal Law Article, and therefore was not a "weapon" under § 4–101(c)(2).

regard to the element of intent[,] ... do not use the majority's
'only' language or language to the effect that the State need
show 'only ... the intentional infliction of serious bodily
harm.' " *Thornton*, 162 Md.App. at 742, 876 A.2d at 155–56
(Eldridge, J., concurring in part and dissenting in part).
According to the dissent, the language relied on by the
majority, from the three cases cited, does not define the
"intentional infliction of serious bodily harm" variety of sec-
ond-degree murder. Moreover, "[t]he language in *Burch v.
State* [, 346 Md. 253, 696 A.2d 443, *cert denied,* 522 U.S. 1001,
118 S.Ct. 571, 139 L.Ed.2d 410 (1997) ], *Mitchell v. State[,* 363
Md. 130, 147, 767 A.2d 844, 853 (2001) ] and the pattern jury
instructions, including as a form of second-degree murder a
homicide with 'the intent to inflict such serious bodily harm
that death would be the likely result,' does not, as suggested
by the majority, 'change' Maryland law or add a new element
to the offense of second-degree murder." *Thornton,* 162
Md.App. at 744, 876 A.2d at 156 (Eldridge, J., concurring in
part and dissenting in part). To the contrary,

> [t]he language 'that death would be the likely result' simply
> clarifies or illuminates the intent element. It is consistent
> with the evidentiary principle that evidence of 'using a
> deadly weapon directed at a vital part of the body' may give
> rise to an inference of an intent to commit grievous bodily
> injury or an intent to kill.

*Id.* (citations omitted). Thus, what the dissent denotes as
"efforts [by the majority panel] to disapprove of the later
opinions of the Court of Appeals in *Burch* and *Mitchell* and to
overrule the pattern jury instructions [,]" according to the
dissent, is not supported by the very cases relied on by the
panel majority. *Thornton,* 162 Md.App. at 743–44, 876 A.2d at
156 (Eldridge, J., concurring in part and dissenting in part).

The intermediate appellate court held further that the evi-
dence was sufficient to support the conviction of second-
degree murder. *Thornton,* 162 Md.App. at 728, 876 A.2d at
148. In addition, the court held that the trial court, by its
rulings on the evidence, neither improperly relieved the State
of its burden to prove that Thornton acted with specific intent

to inflict serious bodily harm, nor presumed that Thornton intended the consequences of his actions and thereby did not unconstitutionally shift to Thornton the burden of proof as to the element of intent. *Thornton*, 162 Md.App. at 731–32, 876 A.2d at 149–150.

■■■■ In order to determine whether the trial judge and the intermediate appellate court correctly interpreted and applied the intent element of second-degree murder to the facts of the instant case, we will review the *mens rea* require-ment for that offense, focusing on the definitions of murder, malice, and grievous bodily harm, including the meaning of the phrase "that death would be the likely result." We emphasize that where murder is predicated upon a theory of intent to commit grievous bodily harm,[4] the intended harm must be grievous bodily harm and must be the legal equivalent of malice. Furthermore, in the context of a murder prosecution, intent to inflict grievous bodily harm means such harm that a reasonable person could or should know, under the circum-stances, would likely result in death to the victim. Because the crime involves an unintentional killing, the defendant need not actually know that his conduct will result in the victim's death. The requisite *mens rea* is measured by an objective standard, i.e., could or should a reasonable person, under the circumstances, have foreseen that death would likely ensue as a result of his or her conduct. Thus, the likelihood require-ment is no more than an objective, not a subjective, standard used to circumscribe and clarify the elements of intent and malice.

---

**4.** The terms "grievous bodily harm," "great bodily harm" or "injury," "serious bodily harm," or "injury," in the context of murder, essential-ly, mean the same thing: something more than bodily injury. The term grievous bodily injury implies an injury that is life threatening. In the words of Professor Lafave, it means "something close to, though of course less than death." *See* Wayne R. Lafave, *Criminal Law* 738 (4th ed.2003) (citing *Wellar v. People*, 30 Mich. 16, 20 (1874) ("Every assault involves bodily harm. But any doctrine which would hold every assailant as a murderer where death follows his act, would be barba-rous and unreasonable."))

We have said that "[i]ntent to commit grievous bodily harm is but one of four qualifying states of minds for murder; specifically, second-degree murder." *Selby v. State,* 361 Md. 319, 335, 761 A.2d 335, 344 (2000) (citing *State v. Earp,* 319 Md. 156, 162, 571 A.2d 1227, 1230 (1990)). It is the absence or presence of malice, which distinguishes murder from manslaughter. *Selby,* 361 Md. at 331–32, 761 A.2d at 342 (citations omitted). The burden rests on the State to prove beyond a reasonable doubt the elements of the crime of second-degree murder. *State v. Evans,* 278 Md. 197, 206, 362 A.2d 629, 634 (1976). "[G]enerally, there are two components to every crime, the *actus reus* or guilty act and the *mens rea* or the guilty mind or mental state accompanying a forbidden act." *Garnett v. State,* 332 Md. 571, 577–78, 632 A.2d 797, 800 (1993) (citations omitted). Limiting our discussion to the element of intent, we note that the State must prove that the defendant acted with a specific intent to inflict grievous bodily harm and malice. *Evans v. State,* 28 Md.App. 640, 700–01, 349 A.2d 300, 337–38 (1975) (noting that the substantive mental element, intent to inflict grievous bodily harm can be proven by direct or circumstantial evidence, and that proof of this mental state constitutes malice by definition), *aff'd sub nom.;* 278 Md. 197, 362 A.2d 629 (1976). It is well settled that "[w]here intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the [trier of fact]. [T]he question of intent can never be ruled as a question of law, but must always be submitted to the [trier of fact]." No presumption of intent may be raised by law from an act. *Morissette v. U.S.,* 342 U.S. 246, 274, 72 S.Ct. 240, 255, 96 L.Ed. 288, 306 (1952). Specifically, malice may be inferred from (1) an act by the accused sufficient to show an intent to inflict great bodily harm or (2) an act the natural tendency of which would cause death or great bodily harm. *Lindsay v. State,* 8 Md.App. 100, 106–07, n. 10, 258 A.2d 760, 764, n. 10 (1969). In other words, the trier of fact may infer malice where the defendant acts without provocation, justification or excuse, and could or should have foreseen that the consequences of his or her

conduct might result in death to another person. *Lindsay,* 8
Md.App. at 109, 258 A.2d at 766 (citing *Clark and Marshall,
Law of Crimes,* § 10.06 p. 577). No presumption arises from
the use of deadly force in a case of homicide. But the trier of
fact is permitted, but not required, to draw an inference of the
intent to inflict grievous bodily harm from the use of deadly
force. *Evans v. State,* 28 Md.App. at 704, 349 A.2d at 340; *see
State v. Evans,* 278 Md. at 205, 362 A.2d at 634 (noting that it
is improper to infer malice from the directing of a deadly
weapon at a vital part of the human anatomy because the use
of deadly force does not itself negate the absence of mitigating
circumstances).

## II.

On August 30, 2002, Thornton, who at the time was sixteen
years old, was at the Towson Town Center Shopping Mall with
friends to shop for the upcoming school year when they ran
into "Jason," who was also with a group of friends, among
them seventeen-year-old Kevin Taylor.

Jan Rebecca Wilson and Matthew Mayrer, called as wit-
nesses for the State, testified that they were employees at the
Rain Forest Café at Towson Town Center Mall. They testified
that they were working there on August 30, and that between
8:30 and 9:00 p.m. that night they were in the parking lot
taking a smoking break. Wilson testified that she heard loud
voices and turned to see two groups of kids arguing about
fifteen feet away. Two of the kids, one from each group, then
got into a physical fight. During the fight, Wilson heard one
kid from the group that was standing closest to her say "which
one of you [expletive] wants to get in on this." In response to
this statement, Taylor stepped up and walked towards the kid
who had spoken with his hands positioned "out on the side in a
ready position." According to Wilson, the kid who had spoken
then pulled out a knife[5] and stabbed Taylor in the stomach.

---

**5.** The knife was entered into evidence. It is a two-bladed folding knife
 that opens and closes and has a guard on each side to lock the blades in
 an open position. Each blade is approximately three inches long and is

Wilson testified that when Taylor was stabbed, it was the individual with the knife who closed the last ground between the two by making one step towards Taylor, followed by a stabbing motion. Taylor's shirt then turned red and he fell to the ground. The individual with the knife fled and Wilson called the police. According to Wilson, the entire confrontation lasted "probably less than five minutes."

Matthew Mayrer testified that he was outside the Rain Forest Café with Wilson when he heard a group of six to ten kids "talking trash" to each other. According to Mayrer, two of the kids started wrestling, and the group divided into two halves cheering on the two combatants. Mayrer testified that one of the spectators on the right hand side said "which one of you [expletive] want to jump in[,]" and that Taylor accepted this challenge and strutted towards the issuer of the challenge with his hands positioned "to his sides in a tough guy position." Taylor did not have a weapon. As Taylor approached Thornton, Thornton lunged forward, apparently to punch Taylor in the stomach. Mayrer realized that Thornton had a knife when, instead of being driven backward as if he had been punched, Taylor froze, and his white shirt immediately burst bright red. Mayrer testified that the last distance between Taylor and Thornton was closed by Thornton.

Detective Gary Childs, another witness called by the State, testified that Thornton admitted to stabbing Taylor in the leg because he was afraid that Taylor would hurt him. Thornton told Detective Childs that he then left the area on a bus and took the knife to the house of an 11-year-old boy, whom he asked to get rid of the knife for him. Thornton subsequently took the investigating detectives to the young boy's house to retrieve the knife. When asked whether Thornton impressed him as a "street wise kid," Detective Childs replied, "not street wise in the sense you know of bad" and that "[Thornton] certainly wouldn't have in the connotation you are asking me taken me to where the knife was if he were street wise."

---

single-edged. When both blades are folded, the knife is approximately five inches long.

Detective Childs further testified that Thornton was "visibly shaken" during his interrogation.

Dr. Aronica–Pollak, Assistant Medical Examiner for the State of Maryland and an expert in the field of forensic pathology, was called as a witness for the State. She testified that the autopsy showed that there were two stab wounds and one cutting wound, and that the victim died from complications with those wounds. The "stab wound [was three inches deep] to the left inguinal area injured the left external iliac artery and vein (major blood vessels), resulting in extensive bleeding." Another stab wound cut one-and-a-half inches deep and was approximately two and a half inches from the three-inch wound. Dr. Aronica–Pollak agreed that that particular wound was a "nonlife-threatening soft tissue wound" and she testified that the cutting wound to the right forearm was a defensive wound, and injured only skin and soft tissue as well. She stated that the wounds "all contribute because they all produced blood, which is why I called them all together in my cause of death, but this one [the three-inch wound] is the one that injured the major blood vessel and the structures."

According to one of Thornton's friends, Orion "Rock" Brandon Beard, who was called as a witness for the defense, Jason and Thornton did not get along and Jason and his group followed Thornton and his group around the mall. Beard and Jason started arguing and agreed to go outside to fight, at which point both groups went out to the parking lot. Beard took off his shirt, punched Jason, and the two started wrestling on the ground.

Nicholas Vance Joyner, another of Thornton's friends present at the scene and called as a witness for the defense, corroborated Beard's testimony. Joyner further testified that once both groups were outside, he saw Beard and Jason start fighting, and that Taylor was getting mad because Jason was losing the fight. Joyner testified that Taylor walked back and forth saying that nobody had better jump in, and that at one point he saw Taylor take off his shirt, approach Thornton with

his fists balled up, and say that "you look like you [sic] going to jump in it." Thornton then took a step back toward the curb and said "stay back," and Taylor continued to go toward him. Joyner looked away and to the fight between Beard and Jason and, when he looked back, Taylor had blood on his shirt. Joyner testified that he later heard Thornton say that he had stabbed Taylor.

Thornton, testifying in his own defense, explained that Taylor was mad that Beard was winning the fight with Jason, and began jumping around and talking about people jumping in the fight. Taylor then took off his shirt which, according to Thornton, meant that he was preparing to fight. Thornton testified that Taylor then headed toward him saying, "I dare you to jump in it, you look like you [sic] about to jump in it," and "I'm going to pop one of you all." Thornton testified that he took a step back onto the curb, but Taylor kept approaching with his fist balled up and looking as though Taylor was going to hit him. According to Thornton, he took out the knife with the intention of scaring Taylor away, but Taylor kept coming and, in response, Thornton said he lunged forward and stabbed Taylor in the leg.

After hearing all of the evidence, the trial judge made the following factual findings and rulings with respect to what occurred that night:

> Jason and Mr. Beard got into a fight.

> Now, here the evidence is in dispute. One side says that—the State's position is from two witnesses that, Ms. Wilson and Mr. Mayrer—they were employees at a restaurant—had gone outside to take a smoke break, and so they witnessed the fight. They have no interest in either side. Their testimony is that at some point in time the Defendant issued a challenge to the other group about joining in the fight. The defense says that it was the victim who issued the challenge.

> I conclude, I find as a fact that at some point in time the Defendant was the one that issued the challenge, and I say

this for several reasons. First of all, he knew he had a knife. Nobody else did but he did.

Secondly, the victim accepted the challenge, and I find that that is when he took his shirt off, and I also find that he did tell others not to get into it but then he approached the Defendant, and he approached the Defendant because the Defendant was the one that had yelled.

Now, he didn't know the Defendant had a knife. He did approach him in a menacing manner, I have no doubt about that, and in an aggressive manner, and the Defendant pulled out the knife, if he didn't have it out already and he expected the victim to back off and the victim didn't, and the Defendant then thrust the knife out at the victim and stabbed him.

It was a serious wound. It partially severed his left sternal iliac artery and vein, both of which are major blood vessels, and it lead to his death.

Now, it is argued that he is entitled to self-defense. Well, in considering, he certainly—I find he's not entitled to perfect self-defense because, first of all, he was the one that raised the level of confrontation to deadly force. Secondly, he could have retreated, which he did after he stabbed him, but he didn't do it before.

Now, I do not believe that he had any specific intent to kill, but we are called upon to be responsible for our actions and when you take a knife such as introduced into evidence as State's Exhibit 7 . . . *one knows that by thrusting that knife out, even though if it was in the leg, it was going to inflict serious bodily harm on whomever was struck and when you inflict serious bodily harm, one of the possible consequences or probable consequences, rather, is death.* So factually I don't believe that he was entitled to an imperfect self-defense because I find, one, that there, by that act there was malice involved. There was no premeditation, *but there was malice, implied malice that way,* and I reject the imperfect self-defense because as I found, I think he—*I find that he was the one that stirred, stirred the pot and stood his ground when the challenge was accepted by the victim.*

So I find him not guilty of first degree murder but I find him guilty of second degree murder and I find him guilty of carrying a weapon openly with the intent to injure.

(Emphasis added.)

### III.

Thornton contended at oral argument, in this Court, that the trial judge committed four legal errors concerning his analysis of the element of intent for second-degree murder. Thornton argued that the trial judge erred: (1) in unconstitutionally shifting the burden of proof for intent to him (by making a presumption of the intent); (2) in stating that because an individual knows that thrusting a knife out could result in death, that satisfies the intent requirement; (3) in equating intent to do grievous bodily harm (second-degree murder) with intent to do serious physical injury (first-degree assault); and (4) in stating that Thornton could be held liable for murder if death were merely a possible consequence of his action (rather than the likely consequence).

Conversely, the State argued that the trial court did not err and Thornton was properly convicted of second-degree murder. According to the State, Thornton was properly convicted, whether second-degree murder is defined as an act done with "intent to commit grievous bodily harm and death occurred in consequence of the attack," or as "killing another person with the intent to inflict such serious bodily harm that death would be the likely result." The State's position is that the evidence was legally sufficient to infer the requisite intent for either definition of second-degree murder and that the trial judge understood the law. The State posits that the trier of fact understood that in order to find Thornton guilty of second-degree murder, Thornton would have had to stab the victim with the intent to inflict grievous bodily harm such that death would be the likely result. And even though the trial judge found there was no intent to kill, he found "malice" in the defendant's actions. The State asserts, also, that because the trial judge properly understood the law, he did not shift

the burden of persuasion to the defendant by erroneously presuming the intent element.

We will address the parties' arguments and their relevance to the instant case, but we will first review the concept of murder and analyze the pertinent elements in order to lay the foundation for our holding.

## MURDER DEFINED

The following description of murder under Maryland law serves as a basis for our analysis:

> Under Maryland law the crime of murder remains a common law crime, although first and second degree murder have been delineated by statute. *See Sifrit v. State*, 383 Md. 116, 138, 857 A.2d 88, 100 (2004); *Mitchell v. State*, 363 Md. 130, 146–47, 767 A.2d 844, 854 (2001).
>
> Section 407 of Art. 27 defined first degree murder as:
>
> All murder which shall be perpetrated by means of poison, or lying in wait, or by any kind of wilful, deliberate and premeditated killing shall be murder in the first degree. Maryland Code (1957, 1996 Repl.Vol.), Art. 27 § 407 was recodified without substantive change as Maryland Code (2002), § 2–201 of the Criminal Law Article.
>
> Section 411 of Art. 27 defined second degree murder as: All other kinds of murder shall be deemed murder in the second degree.
>
> Maryland Code (1957, 1996 Repl.Vol.), Art. 27 § 411 was recodified without substantive change as Maryland Code (2002), § 2–204 of the Criminal Law Article.

*Clemons v. State*, 392 Md. 339, 345 n. 2, 896 A.2d 1059, 1062 n. 2 (2006).

Although second-degree murder is defined by statute as encompassing all "other kinds of murder," this Court has distinguished four different types of second-degree murder.[6]

---

**6.** There is a fourth category of second-degree murder—murder committed in the perpetration of a felony other than those enumerated in the

*Mitchell,* 363 Md. at 146–47, 767 A.2d at 853. In 1997, this Court stated in *Burch,* 346 Md. at 274, 696 A.2d at 454, that:

> Second-degree murder embraces a killing accompanied by any of at least three alternative *mentes reae:* killing another person (other than by poison or lying in wait) with the intent to kill, but without the deliberation and premeditation required for first degree murder; killing another person with the intent to inflict such serious bodily harm that death would be the likely result; and what has become known as depraved heart murder—a killing resulting from 'the deliberate perpetration of a knowingly dangerous act with reckless and wanton unconcern and indifference as to whether anyone is harmed or not.'

(Citations omitted.)

■■■ Earlier, in *Ross v. State,* 308 Md. 337, 340, 519 A.2d 735, 736 (1987), we summarized the crime of murder and the requisite malevolent states of mind but did not mention the concept "that death would be the likely result" of the harm as we did in *Burch and Mitchell.*[7]

We said in *Ross:*

---

first-degree murder statutes. *Roary v. State,* 385 Md. 217, 236, 867 A.2d 1095, 1106 (2005) (holding that assault in the first degree may constitute the predicate felony for second-degree felony murder where defendant's conduct during the course of the felony is "inherently dangerous to life"); *see also Fisher v. State,* 367 Md. 218, 225, 786 A.2d 706, 710 (2001); *Deese v. State,* 367 Md. 293, 296, 786 A.2d 751, 752 (2001).

7. From our review of *Burch* and *Mitchell* there is no clear indication why, at the time those cases were decided, we chose to define second-degree murder in terms of the likelihood that death would ensue. The Court of Special Appeals, however, concluded that "[n]either case addresses the question of what constitutes 'intentional infliction of serious bodily harm' second-degree murder." *Thornton v. State,* 162 Md.App. 719, 727, 876 A.2d 142, 147 (2005).

To the contrary, both cases are instructive in that they specify that the intent element for this form of second-degree murder is an "intent to inflict such serious bodily harm that death would be the likely result." *Burch v. State,* 346 Md. 253, 274, 696 A.2d 443, 454 (1997); *Mitchell v. State,* 363 Md. 130, 147, 767 A.2d 844, 853 (2001). According to the intermediate appellate court, "the two cases perfunctorily and in pass-

Note 7—Continued

ing define second-degree murder, and, as to the intent element, state that 'either an intent to kill or with the intent to inflict such serious bodily harm that death would be the likely result' " is an element of the offense. *Thornton,* 162 Md.App. at 727, 876 A.2d at 146. In our view, however, it should not be surmised that both cases do not set forth definitions of second-degree murder and do not represent the decisional law of this Court. The debate between the majority's view and the dissent, as reflected in the respective opinions of the panel in the intermediate appellate court in this case, was whether *Davis v. State,* 237 Md. 97, 104, 205 A.2d 254, 258 (1964) and MPJI–Cr 4:17.6 "add a likelihood requirement to the 'intentional infliction [of] serious bodily harm' form of second-degree murder." *Thornton,* 162 Md.App. at 728, 876 A.2d at 147. MPJI–Cr 4:17.6 provides:

> Second degree murder does not require premeditation or delibera-
> tion. In order to convict the defendant of second degree murder, the
> State must prove:
> (1) that the conduct of the defendant caused the death of (victim);
> and
> (2) that the defendant engaged in the deadly conduct either with the
> intent to kill or with the intent to inflict such serious bodily harm *that
> death would be the likely result.*

The majority, in the Court of Special Appeals's opinion filed in this case, concluded that the "likelihood requirement" "make[s] express [what has always been] implied: that the intentional infliction of serious bodily harm always carries with it the substantial risk that death will follow." *Thornton,* 162 Md.App. at 728, 876 A.2d at 147. The dissent, however, countered, asserting that "[t]he language 'that death would be the likely result' simply clarifies or illuminates the intent element." *Thornton,* 162 Md.App. at 744, 876 A.2d at 157 (Eldridge, J., concurring in part and dissenting in part). Only a partial answer to the question raised can be found in *Davis v. State, supra.* As Judge Eldridge, in his dissent in the intermediate appellate court, points out, "[t]he principal issue in *Davis v. State* . . . was the validity of a jury instruction that 'all homicides are presumed to be murder and that the burden is on the accused to show circumstances of alleviation, excuse or justification.' " *Thornton,* 162 Md.App. at 743, 876 A.2d at 156 (Eldridge, J., concurring in part and dissenting in part). Although *Davis* upheld the instruction, it was overruled by *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), and *State v. Evans,* 278 Md. 197, 362 A.2d 629 (1976). Specifically, *Davis, supra,* involved a conviction for second-degree murder. The Court acknowledged the "nature of the injuries inflicted upon" the victim, and the "brutality and severity of [the] beating" as evidence of malice and intent to commit a homicide. *Davis,* 237 Md. at 104, 205 A.2d at 258. Although the Court did not define intent to inflict serious bodily harm, *per se,* in terms of the severity of the beating, one could reasonably infer from the nature of the harm inflicted that the crime embraces the kind of injury from which one would likely die. This is supported by this Court's language in *Burch* and *Mitchell.*

In *Burch,* we observed that the beating and stabbing of a 78–year old, 97–pound frail victim, by the defendant, was so severe that the compelling inference from the facts of the case was that the defendant must

Murder is the killing of one human being by another with the requisite malevolent state of mind and without justification, excuse, or mitigation. These qualifying malevolent states of mind are: 1) the intent to kill, 2) the intent to do grievous bodily harm, 3) the intent to do an act under the

---

Note 7—Continued

have acted "with the intent either to kill or to do such serious bodily harm that death would be the likely result." *Burch*, 346 Md. at 280, 696 A.2d at 457 (affirming the trial court's decision that there was no basis for a depraved heart murder instruction as to the Davis victim, but there was a basis for the other instructions, including the intent-to-do-serious-bodily-harm variety of second-degree murder). In *Mitchell*, we acknowledged our decision in *Burch* and observed again "that second degree murder embraced a killing accompanied by any one of at least three alternative states of mind ... [i.e.,] killing another person with the intent to inflict such serious bodily harm that death would be the likely result[.]" *Mitchell*, 363 Md. at 147, 767 A.2d at 853 (noting that "[t]here was no allegation that the conspiracy was merely to inflict such grievous bodily injury that death would be the likely result").

Even in our earlier cases, in the context of our discussion of malice, this Court acknowledged that "malice may be inferred when there is an intent to inflict great bodily harm or when one wilfully does an act, the natural tendency of which is to cause death or great bodily harm." *Faulcon v. State*, 211 Md. 249, 257, 126 A.2d 858, 862 (1956) (holding that "[t]he trial judge could well find from the evidence that Faulcon [deliberately ran over the victim with an automobile], without legal justification or excuse, [and Faulcon] intended to inflict great bodily harm to the deceased, the natural tendency of which was to cause death") *Faulcon*, 211 Md. at 259, 126 A.2d at 863. In *Webb* and *Ward*, *supra*, this Court mentioned that "[i]f the intent were to commit grievous bodily harm, and death occurred as a consequence of the attack, then the case would have been murder in the second degree;" *Webb*, 201 Md. at 162, 93 A.2d at 82; *Ward*, 284 Md. at 199, 396 A.2d at 1048 (quoting Wharton 12th ed. s 841, pp. 1131–1132.) Although, neither case mentions the likelihood requirement, it is not unreasonable to conclude that grievous bodily harm, as the adjective, "grievous" implies, is an injury from which death is likely to ensue. Otherwise, if the law accepted as murder an intention to cause any bodily injury resulting in death, without qualifying the nature of the injury, then there would be no clear distinction between murder and involuntary manslaughter. *See Selby v. State*, 361 Md. 319, 332, 761 A.2d 335, 342 (2000) (noting that an intent to commit grievous bodily harm will support a conviction for murder, and that "[i]nvoluntary manslaughter ... [is] an 'unintentional killing done without malice, by doing some unlawful act endangering life, ....'") (citations omitted); *see also Commonwealth v. Sneed*, 413 Mass. 387, 597 N.E.2d 1346, 1349 (1992) (stating that "if malice could be proved by a showing that the defendant only intended to cause [minor as opposed to great] bodily injury,

circumstances manifesting extreme indifference to the value of human life (depraved heart), or 4) the intent to commit a dangerous felony.

*Id.* (citing Rollin M. Perkins, *Criminal Law* 46 (2d ed.1969)). Stated differently, "[a] murder conviction may ... be supported by proof of any one of four separate *mentes reae.*" *Glenn v. State,* 68 Md.App. 379, 384–85, 511 A.2d 1110, 1113 (1986); *see also* Judge Charles E. Moylan, Jr., *Criminal Homicide Law* 38 (2002). "[E]ach of these four intents is independently blameworthy to support a murder conviction in its own right and [they are not] mere[ly] evidentiary avenue[s] to [proving an intent to kill]." [8] *Id.* at 39. In addition, "[t]he presence of one of these intents is an indispensable ingredient, although not the only necessary ingredient, of that slippery legal concept known as 'malice.'" *Glenn,* 68 Md.App. at 385, 511 A.2d at 1113. (See our discussion, *infra.*)

### Malice

Prior to 1990, most appellate opinions in this State, which discussed the law of murder, pointed out that malice is an indispensable ingredient of murder and defined malice as " 'the intentional doing of a wrongful act to another without legal excuse or justification' and as including 'any wrongful act done wilfully or purposely.' " *See Fisher,* 367 Md. at 273, 786 A.2d at 738 (citations omitted). Malice may be either "express" or "implied." [9] As this Court stated in *Fisher,* "under

---

Note 7—Continued
murder could involve less threatening and less morally blameworthy conduct than involuntary manslaughter").

8. Depraved-heart murder, like intent-to-do-grievous-bodily-harm murder (and felony murder), does not require proof of a specific intent to kill. *Robinson v. State,* 307 Md. 738, 746, 517 A.2d 94, 98 (1986).

9. The distinction between express malice and implied malice is important only for historical purposes. In 1990, apparently recognizing the confusion inherent in using the terms, "express malice" and "implied malice," this Court approved jury instructions that defined, among other crimes, first-degree murder and second-degree murder without using the word "malice." *Bruce v. State,* 318 Md. 706, 732, 569 A.2d 1254, 1267 (1990). *See also* Judge Charles E. Moylan, Jr., *Criminal Homicide Law* 40 (2002). Judge Moylan writing for the intermediate

our decisions, ... there is no requirement that a specific intent to kill, and thus express malice, exist; a person may commit murder without an actual intent to kill (express malice) for the law will infer or imply malice from the attendant circumstances in some unintentional killings." *Id.* at 273, 786 A.2d at 739. (Citations omitted.)

The "likelihood requirement" referred to in *Burch, Mitchell,* and MPJI–Cr 4:17 clearly had its origins in the common law. It is well settled that, "[o]ne may be guilty of murder at common law though there may have been no actual intent to kill. Whether or not the offense is murder depends upon the nature and extent of the injury or wrong actually intended." *Clark and Marshall Law of Crimes, supra,* at 647. The text writers point out that:

Society in an attempt to achieve maximum protection for human life reads in that mental element [i.e., malice] whenever a defendant, acting without provocation, justification or excuse, could or should have foreseen that the consequences of his behavior might result in death to another person.

*Id.* at 645; see also *Commonwealth v. Chance,* 174 Mass. 245, 54 N.E. 551 (1899); *Commonwealth v. Gricus,* 317 Mass. 403, 58 N.E.2d 241 (1944).[10]

---

appellate court in *Evans v. State,* 28 Md.App. 640, 697, 700, 349 A.2d 300, 336–37 (1975), *supra,* explained that intent to inflict grievous bodily harm falls under the umbrella of implied malice. As one of four separate intents, this particular life endangering intent, like the other three, constitutes malice by definition. Thus, there is nothing to infer, presume or imply once one of the four malevolent states of mind have been proven. *Id.*

10. In his 1897 treatise, Lewis Hochheimer stated that "[h]omicide caused by the intentional doing of an act of which death is *the natural and probable consequence* is felonious" (meaning with malice), and so constitutes murder, "but no one is liable for accidental consequences of acts innocent and lawful in themselves, nor for undesigned and improbable consequences of unlawful acts." Lewis Hochheimer, *The Law of Crimes and Criminal Procedure,* 387 (1st ed. 1847) (emphasis added). This passage from Hochheimer highlights the difference between the majority and dissenting opinions in this case when it was before the Court of Special Appeals. We, however, disagree with the panel majority's definition of murder in the second degree of the intent-to-

## INTENT

 In the area of criminal law "[i]ntent has traditionally been defined to include knowledge, and thus it is usually said that one intends certain consequences when he desires that his acts cause those consequences or knows that those consequences are substantially certain to result from his acts." LaFave, *supra*, at 340. We have said that "[a] general *mens rea* or intent 'includes those consequences which (a) represent the very purpose for which an act is done (regardless of the likelihood of occurrence), or (b) are known to be substantially certain to result (regardless of desire).' " *McBurney v. State*, 280 Md. 21, 29, 371 A.2d 129, 133 (1977) (citations omitted). By contrast, a specific intent requires more than the general intent to do the *actus reus*. *Id.* An offense is murder depending upon the results and the nature and extent of the injury or

---

inflict-grievous-bodily-harm type because that definition does not exempt from murder undesigned or improbable consequences that flow from unlawful acts. Thus, "[w]here intent is an element of the [offense], the defendant is entitled to have the [trier of fact] determine intent or absence of intent." *Burch*, 346 Md. 253, 306–07, 696 A.2d 443, 470 (1997).

Herbert Wechsler & Jerome Michael, discussed the debate between Justice Holmes, as to American law, and Justice Stephens, as to English common law. Herbert Wechsler and Jerome Michael, *A Rationale of the Law of Homicide: I*, 37 Colum. L.Rev. 701 (1937). Apparently, "Holmes thought that the actor's awareness of the danger was immaterial if he was aware of circumstances that would lead a man of common experience to conclude that the danger was very great; that the common law employed an external standard even in the case of murder." *Id.* at 710. His rationale apparently was "that one reason why intent to cause serious injury suffices is that death is a highly probable consequence of acts intended to produce such injury." *Id.* at 712 n. 38. Justice Stephens, however, "believed . . . that the actor must have knowledge of the danger and not merely of the circumstances." *Id.* at 710. In other words, Holmes's position w as that implied malice meant that "a man might have to answer with his life for consequences which he neither intended nor foresaw. . . . [H]is failure or inability to predict [the consequences of his actions] was immaterial, if under the circumstances known to him, the court or jury, as the case might be, thought them obvious. *Id.* at 710 n. 31. Holmes's view is contrary to Thornton's assertion in this Court and in the Court of Special Appeals that the State must prove, as a separate element of its case-in-chief for murder, that the defendant was actually aware of the risk of the victim's death.

wrong actually intended. Intent to inflict grievous bodily harm is a distinct form of second-degree murder and constitutes a specific intent crime. *See* discussion, *infra* (Specific Intent Crime). Judge Campbell described the requisite intent for this type of murder in *Wellar v. People,* 30 Mich. 16, 19–20 (1874):

> It is not necessary in all cases that one held for murder must have intended to take the life of the person he slays by his wrongful act. . . . But it is necessary that *the intent with which he acted shall be equivalent in legal character to a criminal purpose aimed against life. . . . And if the intent be directly to produce a bodily injury, it must be such an injury as may be expected to involve serious consequences, either perilling life or leading to great bodily harm.* There is no rule recognized as authority which will allow a conviction of murder where a fatal result was not intended, unless the injury intended was one of a very serious character which might naturally and commonly involve loss of life or grievous mischief.

(Emphasis added.) As we have previously discussed, malice is a necessary element of murder, and may be proven by direct or indirect evidence and the surrounding circumstances, including the words and actions of the defendant.[11]

### 1. As Compared with Assault

The requisite mental state for murder in the second degree of the intent-to-inflict-grievous-bodily-harm variety is distinct from the requisite mental state for assault in the first degree.[12] Maryland courts have held that such acts as spraying

---

11. "The design 'is not confined to an intention to take away the life of the deceased, but includes an intent to do any unlawful act, which may probably end in depriving the party of life.' " *Bantum v. State,* 85 A.2d 741, 751 n. 2 (Del.1952) (citations omitted).

12. *See Robinson v. State,* 353 Md. 683, 691–92, 728 A.2d 698 701–02(1999) for an analysis of the statutory history of Md.Code (2002, Repl.Vol.), § 3–202 of the Criminal Law Article, formerly Art. 27, §§ 12, 12A and 12A–1, repealed by 1996 Laws of Maryland, Ch. 632.

an individual in the eyes with pepper spray, or a bite on the arm, resulting in scarring, may constitute first-degree assault. *See Handy v. State*, 357 Md. 685, 700, 745 A.2d 1107, 1115 (2000) (recognizing that "the use of the pepper spray in ... [that] case did in fact cause the victim to suffer protracted loss or impairment of his vision[,]" satisfying the elements of first-degree assault); *Thomas v. State*, 128 Md.App. 274, 303, 737 A.2d 622, 637 (1999) (holding that a bite wound on the arm that left the victim with a serious permanent or protracted disfigurement was sufficient to constitute serious physical injury within the context of first-degree assault). These acts can cause serious physical injuries, but are not necessarily sufficient alone to establish an intent to commit grievous bodily harm.

A person may be guilty of one out of four possible forms of first-degree assault, under Md.Code (2002), § 3–202 of the Criminal Law Article, if he "intentionally cause[s] or at-

---

In 1996, the Maryland General Assembly enacted Art. 27, §§ 12, 12A and 12A-1, effective October 1, 1996. 1996 Laws of Maryland, Ch. 632. These statutes provide as follows: § **12. Definitions.** (a) *In general.*—In this subheading the following words have the meanings indicated. (b) *Assault.*—Except as otherwise provided in this subheading, "assault" means the offenses of assault, battery, and assault and battery, which terms retain their judicially determined meanings. (c) *Serious physical injury.*—"Serious physical injury" means physical injury which: (1) Creates a substantial risk of death; (2) Causes serious permanent or serious protracted disfigurement; (3) Causes serious permanent or serious protracted loss of the function of any bodily member or organ; or (4) Causes serious permanent or serious protracted impairment of the function of any bodily member or organ.

§ *12A.* **Second degree assault.** (a) *General Prohibition.*—A person may not commit an assault. (b) *Violation; penalties.*—A person who violates this section is guilty of the misdemeanor of assault in the second degree and on conviction is subject to a fine of not more than $2,500 or imprisonment for not more than 10 years or both.

§ *12A-1.* **First degree assault.** (a) *Serious physical injury; use of a firearm.*—(1) A person may not intentionally cause or attempt to cause serious physical injury to another. (2) A person may not commit an assault with a firearm .... (b) *Penalty.*—A person who violates this section is guilty of the felony of assault in the first degree and on conviction is subject to imprisonment for not more than 25 years.

tempt[s] to cause serious physical injury to another," where "serious physical injury" means injury which, "[c]reates a substantial risk of death." "Serious physical injury" constitutes a broad statutory concept that by definition covers physical injury that may or may not cause a victim's death. This differs from grievous-bodily-harm murder, and not only in the ultimate result where the victim dies. A person is guilty of the intent-to-do-grievous-bodily-harm form of murder *only* if he or she has the requisite intent (and malice) to cause such severe harm that death would be *the* likely result, not merely a possible result. Judge Eldridge illustrated this distinction in a hypothetical, stating:

> Under the majority's and the trial court's formulation, ... if an accused directs a knife at the victim's finger, intending to inflict serious bodily harm, and the finger is severed, and, unknown to the accused, the victim is a hemophiliac, and bleeds to death, the accused will be guilty of second degree murder. The formulation of the "intent" element set forth in *Burch, Mitchell,* and the pattern jury instructions, would avoid this result.

*Thornton,* 162 Md.App. at 744, 876 A.2d at 157 (Eldridge, J., concurring in part and dissenting in part). A defendant should only be held liable for second-degree murder if death would be the likely result of the harm that he intended. The requisite intent for murder of the intent-to-inflict-grievous-bodily-harm modality is a narrow concept. The requisite intent for the statutory crime of assault in the first degree, however, is a much broader concept and embraces at least four separate and distinct modalities.

## 2. Specific Intent Crime

A specific intent crime requires that the defendant, upon doing the act, have "some intent other than to do the *actus reus* thereof...." *McBurney,* 280 Md. at 29, 371 A.2d at 133 (quoting Rollin M. Perkins, Criminal Law 762 (2d ed.1969)). The defendant must have "the additional deliberate and conscious purpose or design of accomplishing a very specific and remote result." *Shell v. State,* 307 Md. 46, 63, 512 A.2d 358, 366 (1986). In *Fisher,* this Court said that

'[a] specific intent is not simply the intent to do the immediate act but embraces the requirement that the mind be conscious of a more remote purpose or design which shall eventuate from the doing of the immediate act.... [Specific intent crimes] require[ ] not simply the general intent to do the immediate act with no particular, clear or undifferentiated end in mind, but the additional deliberate and conscious purpose or design of accomplishing a very specific and more remote result.'

367 Md. at 274, 786 A.2d at 739 (citations omitted).

With crimes which require that the defendant intentionally cause a specific result, what is meant by an "intention" to cause that result? Although the theorists have not always been in agreement as to the answer to this question, the traditional view is that a person who acts (or omits to act) intends a result of his act (or omission) under two quite different circumstances: (1) when he consciously desires that result, whatever the likelihood of that result happening from his conduct; and (2) when he knows that that result is practically certain to follow from his conduct, whatever his desire may be as to that result.

LaFave, *supra*, at 341.

Murder of the intent-to-inflict-grievous-bodily-harm type is, by definition, a specific intent crime, even though there is no conscious or purposeful design to kill the victim. *Fisher*, 367 Md. at 274, 786 A.2d at 739. In *Glenn*, 68 Md.App. at 390, 511 A.2d at 1116, the intermediate appellate court acknowledged that "[t]he critical distinction that needs to be made ... is between *the results specifically intended, not between the presence or absence of a specific intent.* Although there is the purpose or design that the victim should suffer serious physical harm, there is no necessary purpose or design that the victim should die"[13] (citations omitted). *See*

---

**13.** Judge Wilner's analysis in *Jenkins v. State*, 59 Md.App. 612, 618, 477 A.2d 791, 794 (1984), *reversed in part, State v. Jenkins*, 307 Md. 501, 515 A.2d 465 (1986), is illustrative:

*also* Moylan, *supra*, at 95. (The difference between specific intent-to-kill murder and specific intent to commit grievous bodily harm is in the results specifically intended.). The following hypothetical is often cited to illustrate the concept:

I deliberately amputated the arms and legs of my enemy for the purpose of rendering him a quadriplegic for the rest of his long and miserable life. I did not remotely desire that a merciful death should intervene to frustrate my design.

A fact finder, of course, need not believe such a statement, and probably would not. That is beside the point. The issue is: *If* the fact finder *should* explicitly find such a stated intent to be the fact, what would its legal significance be in terms of [murder]?

The answer is ... [that s]ociety's response is that a death resulting from a defendant's possession of such a *mens rea* is just as blameworthy and just as worthy of punishment as if there had been an actual intent to kill. It is an independent murderous *mens rea* in its own right and no mere pale reflection of the intent to kill.

---

An intent to maim, disfigure, or disable [virtually, if not completely, distinguishable from the intent to do grievous bodily harm] necessarily falls short of, and thus excludes, an intent to kill. The actor's object in such a case is *not* to end the victim's life, but to have him linger on, either temporarily or permanently, in a disabled or disfigured condition. Conversely, although death is obviously the ultimate form of disablement, it is far more than that; one does not generally regard a killing as merely an extreme form of disablement. It is not the marking or hobbling of the victim that is really intended, but the termination of his very existence. That is the critical, overriding intent, even if death is to be preceded, or caused, by injuries that but for the death would constitute a disfigurement or disablement. Thus, both rationally and realistically, an intent to kill excludes the lesser intent merely to maim, disfigure, or disable.

(Emphasis in original.) Acknowledging Judge Wilner's discussion in *Jenkins, supra,* the Court of Special Appeals in *Glenn* observed that "the inchoate form of intent-to-commit-grievous-bodily-harm murder is assault with intent to maim, disfigure, or disable." *Glenn,* 68 Md.App. at 390, 511 A.2d at 1116. Thus, it is clear, in some cases, that the specific intent to commit an assault in the first degree, under the statutory offense, may be sufficient to satisfy the intent element of second-degree murder.

Moylan, *supra*, at 96 (quoting *Glenn*, 68 Md.App. at 394 n. 8, 511 A.2d at 1120, n. 8). Thus, the trier of fact may find the requisite intent for second-degree murder, even where the defendant did not intend to kill the victim, but did intend to inflict grievous bodily harm.[14] Murder of the intent-to-do-grievous-bodily-harm type is a specific intent crime, and the specific intent necessary for conviction is the intent to do serious bodily injury, that death would be the likely result. Again, the intent is measured by an objective standard. The four alternative mental states that will establish the *mens rea* of murder, one of which is an intent to inflict grievous bodily harm, may be proven directly or indirectly by inference. *Evans v. State*, 28 Md.App. at 701–02, 349 A.2d at 338.

In *Sandstrom v. Montana*, 442 U.S. 510, 517–18, 99 S.Ct. 2450, 2456, 61 L.Ed.2d 39, 46–47 (1979), the United States Supreme Court clarified the substantive law and stated that, only an inference, rather than a presumption of intent, may be drawn from voluntary acts. Otherwise, if the trier of fact is allowed to presume that one intends the natural and probable consequences of his or her acts, in the context of a criminal case, as a matter of substantive law, the rule "would in effect destroy the concept of intention and replace it entirely with negligence[,] ... [and] the defendant would be held to have intended whatever a reasonable man would have foreseen as

---

**14.** *See* Rollin M. Perkins and Ronald N. Boyce, *Criminal Law* 59 (3rd Ed.1982). Depending upon the inference drawn by the trier of fact, "[a]n intent to inflict great bodily injury is sufficient for malice ... if there is no justification, excuse, or mitigation"; *Couser v. State*, 221 Md. 474, 475–76, 157 A.2d 426, 427 (1960) (holding that the defendant's act of stabbing a police officer with a switchblade knife was sufficient to show an intent to inflict grievous bodily harm where defendant stabbed the officer in the thigh during a struggle and the weapon was aimed at the officer's abdomen with the intent to incapacitate him); *Abney v. State*, 244 Md. 444, 449, 223 A.2d 792, 795–96 (1966) (holding that the evidence was sufficient to support a finding of malice in the killing and murder in the second degree where the defendant threatened to shoot or kill anyone who tried to break up the fight and he in fact shot the victim, even though the defendant claimed that the shooting was unintended, accidental and that he lacked capacity to commit murder due to his epilepsy, and drug and alcohol use).

probable." Wayne R. LaFave, *Substantive Criminal Law* 355 (2nd ed.2003).

Specifically, in *Sandstrom*, the defendant was charged with deliberate homicide, which, under Montana law, required proof that the defendant purposely or knowingly caused the death of another. *Sandstrom*, 442 U.S. at 512, 99 S.Ct. at 2453, 61 L.Ed.2d at 43. The trial judge instructed the jury, in accordance with Montana law, that the " 'law presumes that a person intends the ordinary consequences of his voluntary acts.' " *Sandstrom*, 442 U.S. at 513, 99 S.Ct. at 2453, 61 L.Ed.2d at 44 (citations omitted). The United States Supreme Court reversed Sandstrom's murder conviction on the ground that the instruction to the jury violated "the Fourteenth Amendment's requirement that the State prove every element of a criminal offense beyond a reasonable doubt." *Sandstrom*, 442 U.S. at 512, 99 S.Ct. at 2453, 61 L.Ed.2d at 43. Rejecting the State's argument that the instruction described only a permissive inference, the Court reasoned that the jurors "were not told that they had a choice, or that they might infer that conclusion; they were told only that the law presumed it." *Sandstrom*, 442 U.S. at 515, 99 S.Ct. at 2454, 61 L.Ed.2d at 45. The Court explained further that, the jury might "have interpreted the instruction in either of two [ ] stringent ways .... as an irrebuttable direction by the court to find intent once convinced of the facts triggering the presumption[, or] ... to find [guilt] upon proof of the defendant's voluntary actions (and their 'ordinary' consequences), unless the defendant proved the contrary...." *Sandstrom*, 442 U.S. at 517, 99 S.Ct. at 2456, 61 L.Ed.2d at 46–47. Thus, the Court ultimately held that a conclusive presumption, in the context of that criminal trial, would be unconstitutional as it "would 'conflict with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime,' and would 'invade [the] factfinding function' which in a criminal case the law assigns solely to the [trier of fact]." *Sandstrom*, 442 U.S. at 523, 99 S.Ct. at 2459, 61 L.Ed.2d at 50. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d

368, 375 (1970) (holding "that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is [tried]"). Thus, it is permissible under Maryland law to infer an intent to kill or intent to do grievous bodily harm from the use of deadly force, but it is not permissible to presume, in a contested case, such intent from facts in evidence without improperly shifting the burden of proof.[15] The requisite intent may be established by either direct or circumstantial evidence.[16]

---

**15.** In this opinion, we draw a distinction between the terms "inference," or "infer" and "presumption," or "presume." An inference "allows—but does not require—the trier of fact to infer the elemental fact from proof by the prosecutor of the basic [fact] ..." and the inference places no burden on the defendant of any kind and does not shift the burden of proof. By contrast, a mandatory presumption "may affect not only the strength of the 'no reasonable doubt' burden but also the placement of that burden; it tells the trier of fact that [it] *must* find the elemental fact upon proof of the basic fact, at least unless the defendant has come forward with some evidence to rebut the presumed connection between the two facts." *See County Court of Ulster County, New York v. Allen,* 442 U.S. 140, 156–57, 99 S.Ct. 2213, 2224–25, 60 L.Ed.2d 777, 792 (1979) (citations omitted).

As the trier of fact, the trial judge, in this case, was entitled to draw reasonable inferences from established facts. This Court long ago adopted the policy that the trier of fact may infer that one intends the natural and foreseeable consequences of his or her conduct. *Davis v. State,* 204 Md. 44, 51, 102 A.2d 816, 819–20 (1954); *see also, Glenn v. State,* 68 Md.App. 379, 409, 511 A.2d 1110, 1126, *cert. denied,* 307 Md. 599, 516 A.2d 569 (1986) (noting that it is always permissible to infer that one intends the natural and foreseeable consequences of his or her conduct); *Ford v. State,* 330 Md. 682, 704, 625 A.2d 984, 994 (1993) (holding that under the circumstances of that case it was reasonable to infer "that a 'natural and probable consequence' of throwing a large rock through the windshield of a fast moving vehicle [was] permanent injury of various forms to the vehicle's occupants").

**16.** It is well settled in this State that a deadly weapon is generally any instrument with which death may be readily or easily produced; the instrument constitutes a deadly weapon either in its nature or in the manner in which it is used. *See Brooks v. State,* 314 Md. 585, 600, 552 A.2d 872, 880 (1989) (holding that a deadly weapon is any instrument "(1) ... designed to be used in destroying, defeating, or injuring an enemy, or as an instrument of offensive or defensive combat; (2) under the circumstances of the case, immediately useable to inflict serious or deadly harm ...; or (3) actually used in a way likely to inflict that sort of harm ...").

## IV.

In the present case, the trial judge found that Thornton did not possess a specific intent to kill his victim. According to the autopsy report, Taylor was stabbed in the left leg, in the front of his thigh in the area near his groin. The judge accepted Thornton's testimony that he stabbed Taylor "just to get him away" and that Thornton pulled the knife out "expect[ing] [Taylor] to back off." According to the trier of fact, the stabbing occurred after Thornton had challenged the other group to join in the fight and Taylor accepted that challenge. The trial judge also indicated that malice was implied. Yet, at no time, did the trial judge state that Thornton stabbed Taylor with the intent to inflict grievous bodily harm. Essentially, the trial judge reasoned that because Thornton was responsible for his actions, i.e., stabbing Taylor one time in the leg, he, therefore, must have known that the act would inflict serious bodily harm and that death would be a possible or probable consequence of that harm. Thus, the issue for our review is whether the trial judge inferred intent to inflict grievous bodily harm from the facts as found or shifted the burden of proof of that element to Thornton. The only way to resolve that question is to examine what the trial judge said in reaching the result in this case. Ordinarily, we will presume that the trial judge knows the law and applies it properly. That presumption, however, is rebuttable. *State v. Chaney*, 375 Md. 168, 184, 825 A.2d 452, 461 (2003).

Significantly, while discussing the legal meaning of the phrase "intent to inflict such serious bodily harm that death would be the likely result," the trial judge stated:

> [I]f subjectively he's thinking, yeah, he swings out and stabs him in the leg just to get him away but he dies, and he at no time had any intent to kill anybody ... but he uses ... [what] turns out to be serious bodily harm, even though that wasn't what he was after ... I mean, isn't the law that you do something like that, the consequences are yours.

In this statement, even though the judge, arguably, was speaking hypothetically, he incorrectly stated the required *mens rea* for second-degree murder of the intent-to-do-grievous-bodily-harm type. The statement is consistent with other comments the trial judge made while discussing the intent element of the crime. To the contrary, "using what turns out to be serious bodily harm," cannot serve as a substitute for intent to inflict grievous bodily harm. The intent to inflict grievous bodily harm is a life-threatening state of mind. Thus, in order to convict Thornton, the trier of fact was required to find that Thornton's desire or purpose was to inflict such harm that a reasonable person, under the circumstances, could or should have anticipated that death would likely occur. Consequently, Thornton cannot be held liable, under an objective standard, for the ultimate consequence of death, if death or serious bodily harm "wasn't what he was after." Later in his comments, while issuing a ruling as to his findings and conclusions of law, the trial judge stated:

> [W]e are called upon to be responsible for our actions and when you take a knife such as introduced into evidence as State's Exhibit 7 . . . one knows that by thrusting that knife out, even though if it was in the leg, it was going to inflict serious bodily harm on whomever was struck and when you inflict serious bodily harm, one of the possible consequences or probable consequences rather, is death.

Here, the trial judge erred by substituting the notion of responsibility for one's actions and the act of stabbing the victim in the leg for knowledge that death would likely occur. First, use of the knife to stab Taylor in the leg does not necessarily mean that Thornton possessed the intent to inflict grievous bodily harm such that death would be the likely result. Moreover, in this case, no determination was made that the leg or any part of the leg constituted a vital part of the human anatomy or that intent was inferred from the manner in which the knife was used. Next, merely because Thornton may be blameworthy, because of the consequences of his actions, does not mean that he either had a desire to bring about those results or that those results were probable.

The trial judge's explanation, above, on the issue of criminal responsibility does not support a finding that Thornton acted with the intent to inflict grievous bodily harm such that death would be the likely result. In addition, the trial judge's reasoning is inconsistent with his earlier determination that Thornton pulled the knife out "expect[ing] [Taylor] to back off," and because Taylor did not back off Thornton stabbed him in the leg. Likewise, that finding does not support a conclusion that Thornton stabbed Taylor with the intent to inflict grievous bodily harm. Essentially, the trial judge found that because Thornton caused the injury to Taylor and death resulted, Thornton was guilty of murder. This determination resulted in a presumption that Thornton intended the consequences of his actions and a modification of the *mens rea* requirement for specific intent-to-inflict-grievous-bodily-harm murder.

A specific intent crime "requires not simply the general intent to do the immediate act with no particular, clear or undifferentiated end in mind, but the additional deliberate and conscious purpose or design of accomplishing a very specific and more remote result." *Shell*, 307 Md. at 63, 512 A.2d at 366 (citations omitted). Mere knowledge that a result is substantially certain to follow from one's actions is not the same as the specific intent or desire to achieve that result. *See McBurney*, 280 Md. at 29, 371 A.2d at 133 (explaining that "a general *mens rea* or intent 'includes those consequences which . . . are known to be substantially certain to result (regardless of desire). A specific intent . . . is some intent other than to do the *actus reus* thereof which is specifically required for guilt.'") (citations omitted).

Further, we agree with Thornton's argument that by holding him responsible for his actions without finding the requisite intent for murder in the second degree, the trial judge erred and, in effect, shifted the burden of proof of the element of intent to Thornton. The trier of fact may draw inferences from the facts presented in the case, but the trier of fact may not presume an element of the State's case. As Thornton

points out, such shifting of the burden of proof is in direct violation of the due process provisions contained in the Fourteenth Amendment to the United States Constitution[17] and Article 24 of the Maryland Declaration of Rights.[18] Similar to the facts in *Sandstrom*, 442 U.S. at 517–18, 99 S.Ct. at 2455–56, 61 L.Ed.2d at 47, the trial judge in the present case stated that "we are called upon to be responsible for our actions," and that, if "you do something like that, the consequences are yours[;]" he, shifted the burden of proof to the defendant, by presuming that he intended the consequences of his actions.

We hold also that the trial judge, as did the intermediate appellate court, erred in equating intent to do grievous bodily harm (second-degree murder) with intent to do serious physical injury (first-degree assault). As Thornton argued, it has never been the law of Maryland that any time someone causes an injury and death results, he or she is liable for murder. It is the State's burden to prove both the *actus reus* and the *mens rea* elements of the crime of murder beyond a reasonable doubt. *See Sandstrom, supra.* Malice is an essential element of second-degree murder, whereas first-degree assault may involve malice, but does not require it. Under Maryland law, the use of pepper spray may constitute a first-degree assault, but the commission of such an offense, assuming it could contribute to a victim's death, would not necessarily constitute murder. Consistent with the intermediate appellate court's analysis in this case, any first-degree assault

---

17. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST. amend. XIV, § 1.

18. Md. Dec. of R. art. 24, "Due process," states: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

resulting in death would constitute murder; such a conclusion paints with too broad a brush the definition of murder. Moreover, we distinguish our decision in *Roary*, 385 Md. at 236, 867 A.2d at 1106 (holding that first-degree assault may be the underlying felony in a felony-murder prosecution) from the instant case because pursuant to our holding in *Roary*, a person may be convicted of second-degree felony-murder only if the felony constitutes an "inherently dangerous to life" felony. *Roary*, 385 Md. at 235–36, 867 A.2d at 1105. No such theory was advanced in this case.

Thornton contends that the Court of Special Appeals, in its opinion affirming the trial court, "erred when it eliminated an essential element of the required *mens rea* for the intent-to-inflict-grievous-bodily-harm form of second-degree murder," by removing the likelihood requirement from the definition of the offense. First, we disagree with Thornton's argument that the defendant must actually know with certainty that death will follow his actions. As we have stated, previously, in the process of finding intent to inflict serious bodily harm, the trier of fact employs an objective standard to determine the reasonable inferences that may be drawn from the defendant's conduct. Under these circumstances, it is relevant that the defendant claims he did not intend to kill the victim or did not realize that the victim could have died from a stab wound to the leg, but such assertions are not dispositive because the requisite intent to inflict grievous bodily harm is measured against an objective standard.

The intermediate appellate court majority cited several older cases for the proposition that "to prove second-degree murder, the evidence need *only* show that the death of the victim resulted from the intentional infliction of serious bodily harm." *See Webb* and *Ward, supra.* The court focused on the question of whether MPJI–Cr 4:17 "changed" the law of Maryland by including the phrase "that death would be the likely result." [19] The majority concluded that MPJI–Cr could

---

19. MPJI–Cr 4:17.6 provides:

not substantively change the law of Maryland, as pattern jury instructions are merely advisory, and are not *per se* the decisional law of this Court. *Thornton,* 162 Md.App. at 727, 876 A.2d at 147. The intermediate appellate court found that "what [MPJI–Cr 4:17] does do is make express that which was always implied: that the intentional infliction of serious bodily harm always carries with it the substantial risk that death will follow." Judge Eldridge's opinion, dissenting in part, points out that "[t]he language 'that death would be the likely result' simply clarifies or illuminates the intent element." *Thornton,* 162 Md.App. at 744, 876 A.2d at 157 (Eldridge, J., concurring in part and dissenting in part). This Court, consistent with the dissenting opinion, also interprets the phrase "grievous bodily harm" to mean that, by definition, harm is measured by an objective standard.

The qualification, "that death would be the likely result," both circumscribes and clarifies the intent element of second-degree murder of the type under consideration. Moreover, the panel majority did not acknowledge the difference between serious bodily harm in the context of murder and in the context of an assault. Second-degree murder of the intent to inflict grievous bodily harm is neither a strict liability crime nor a crime predicated upon a theory of negligence. Accordingly, the State must prove intent to injure the victim so severely that death would be the likely result even though the defendant did not intend that the victim should die. Malice remains an element of the prosecution's case. It can be satisfied by proving the intent to inflict such grievous bodily harm that death would be the likely result. Conversely, in the prosecution for an assault, in either the first or second degree,

---

Second degree murder does not require premeditation or deliberation. In order to convict the defendant of second degree murder, the State 38 must prove:

(1) that the conduct of the defendant caused the death of (victim); and

(2) that the defendant engaged in the deadly conduct either with the intent to kill or with the intent to inflict such serious bodily harm *that death would be the likely result.*

(Emphasis added.)

the State is not required to prove, in either case, that death would be a likely result of the defendant's conduct or that the defendant's conduct was malicious. These are crucial distinctions that were omitted from the intermediate appellate court's analysis when it stated that "to prove second-degree murder, the evidence need *only* show that the death of the victim resulted from the intentional infliction of serious bodily harm."

In summary, the trial judge's mistaken conclusions of law, which modified the specific intent requirement and unconstitutionally shifted the burden of proof to Thornton, warrants our reversal of Thornton's conviction for murder in the second degree and a remand of the case for a new trial. *See Lipinski v. State*, 333 Md. 582, 592, 636 A.2d 994, 999 (1994) (holding that where the trial judge improperly defined the elements of deliberation and premeditation a remand for a new trial was proper).

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. THE CASE IS REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND REMAND THE CASE TO THAT COURT FOR THE PURPOSE OF A NEW TRIAL. BALTIMORE COUNTY TO PAY THE COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.**